[No. A115399. First Dist., Div. One. July 24, 2008.]

CARLA M. CLARK et al., Plaintiffs and Appellants, v.
OPTICAL COATING LABORATORY, INC., Defendant and Respondent.

[No. A115445. First Dist., Div. One. July 24, 2008.]

CARLA M. CLARK et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents;
CHARLES D. COCHRAN, Objector and Appellant.

[No. A115474. First Dist., Div. One. July 24, 2008.]

CARLA M. CLARK et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents;
KEITH A. ROBINSON et al., Objectors and Appellants.

[Nos. A116164, A116901. First Dist., Div. One. July 24, 2008.]

CARLA M. CLARK et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA, Defendant and Respondent.

COUNSEL

Dell'Ario & LeBoeuf, Alan Charles Dell'Ario, Jacques LeBoeuf; Gonzalez & Robinson, Joseph D. Gonzalez and Keith A. Robinson for Plaintiffs and Appellants.

Eisenberg and Hancock, Jon B. Eisenberg and William N. Hancock for Objectors and Appellants Keith A. Robinson and Gonzalez & Robinson.

Waxler Carner Weinreb Brodsky, Andrew J. Waxler and Gretchen S. Carner for Objector and Appellant Charles D. Cochran.

Edmund G. Brown, Jr., Attorney General, David Chaney, Chief Assistant Attorney General, James Schiavenza, Assistant Attorney General, Tyler B. Pon and David W. Hamilton, Deputy Attorneys General, for Defendant and Respondent State of California.

Barg Coffin Lewis & Trapp, John F. Bargand and Jonathan Polland for Defendant and Respondent Union Pacific Railroad Company.

Collette Erickson Farmer & O'Neill, John V. Erickson and Robert S. Lawrence for Defendant and Respondent Optical Coating Laboratory, Inc.

OPINION

**MARGULIES, J.**—This toxic tort lawsuit by 32 plaintiffs went to a jury trial against defendants the State of California (the State), Southern Pacific Transportation Company (Union Pacific), and Optical Coating Laboratory, Inc. (OCLI). The trial was marked by repeated objections, sustained by the court, that plaintiffs' attorneys were violating its in limine orders. Ultimately, after warning the attorneys that they were risking a mistrial and exposing themselves to substantial sanctions, the court declared a mistrial based on their cumulative misconduct.

Following the mistrial, the trial court took the following actions from which these consolidated appeals were taken: (1) awarded all defendants a combined total of $1,151,041.25 in attorney fees and costs as sanctions against plaintiffs' attorneys; (2) reconsidered and granted dispositive motions by OCLI and the State that had been denied before trial commenced; and (3) made a separate award to the State of $672,501.25 in attorney fees and $439,535.31 in expert witness fees jointly and severally against all plaintiffs.

Finding no legal basis for the attorney fees, costs, and expert witness fees awarded as sanctions against plaintiffs and their attorneys, we reverse those awards. We also reverse the judgment in favor of OCLI. We affirm the judgment in favor of the State, and the expert fee award made to the State under Code of Civil Procedure[1] section 998.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Overview of Plaintiffs' Allegations*

Plaintiffs are 32 individuals who have all lived or worked in the West College Avenue neighborhood of Santa Rosa. In 2000, plaintiffs learned that the private water wells they used for drinking water had been contaminated with trichlorethylene (TCE) and perchlorethylene (PCE). They eventually retained the law firm of Gonzalez & Robinson to investigate the cause of the contamination and pursue compensation from those responsible. Plaintiffs claimed that the contamination caused them to suffer both economic losses and a wide range of adverse health effects.

In 2001, plaintiffs sued the City of Santa Rosa, the County of Sonoma, the State, Union Pacific, OCLI, and several entities that formerly owned or operated dry cleaning businesses near the West College Avenue neighborhood. The trial was bifurcated into liability and damages phases. Just prior to

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

jury selection in the liability phase, all of the solvent defendants—except the State, Union Pacific, and OCLI—settled with plaintiffs.

The relevant facts and allegations pertaining to these three defendants may be summarized as follows:

Union Pacific owned a nine and one-half acre parcel of land, known as 99 Frances Street, located approximately one-half mile northeast of the West College Avenue neighborhood. Beginning in 1967, the Frances Street property and a smaller adjacent property, 1143 Briggs Avenue, had been leased for use by a succession of scrap metal recyclers and auto wreckers. In 1988, the North Coast Regional Water Quality Control Board (Water Board) discovered that the Frances Street site was contaminated with leaking 55-gallon drums, old batteries, large quantities of shredded metal, and aboveground and underground storage tanks. Ultimately, both sites were found to be highly contaminated with TCE, PCE, and other toxic chemicals. Plaintiffs alleged that those contaminants seeped into the groundwater beneath the sites and ultimately migrated into plaintiffs' wells, contributing to their contamination.

OCLI has maintained a facility in Santa Rosa since the 1950's. OCLI developed thin film coating processes for government and industry, and created products at its Santa Rosa facility that use high performance optical thin films to manage light, such as solar cell covers on satellites, camera lenses, and mirrors used in copiers and scanners. In the process of creating certain of its products, OCLI used various industrial solvents, including acetone, PCE, TCE, trichorethane (TCA), and freon 113. Plaintiffs allege that OCLI disposed of over 300 drums containing toxic wastes, including PCE and TCE, at the Frances Street site. They allege that these contaminants migrated from that site onto their properties and into their well water.

Plaintiffs' allegations linking OCLI to the site were based in part on three internal Water Board memoranda. Two of the memos, written in 1990, purported to summarize conversations with an anonymous tipster who claimed that as an employee of Donald Kessler, the owner of an auto wrecking yard leasing the Briggs Avenue site, he had transported a truckload of 55-gallon drums from OCLI to be dumped at the site in approximately 1973. According to the memos, the tipster reported that, at Kessler's instruction, he had emptied the drums' liquid contents on the ground before dumping them. He had seen a total of approximately 300 drums at OCLI ready for disposal on that occasion. The third memo, written two years later, purported to summarize a 1992 telephone conversation between a Water Board staffer and Kessler.[2] According to that handwritten memo, Kessler

---

[2] Kessler had passed away by the time the lawsuit was filed.

stated that drums were in fact either picked up or delivered to his site from OCLI and that, although the drums were supposed to be empty because they were to be used by him for storage of metal waste, some of the drums probably had liquid in them and employees "weren't always paying attention to the matter."

According to plaintiffs, the State's liability arises vicariously from the failure of certain Water Board employees to immediately notify local officials in July 1988, after the Water Board issued a cleanup and abatement order for the Frances Street site, that the contamination of that site was "likely to cause substantial injury to the public health or safety" within the meaning of Health and Safety Code section 25180.7, subdivision (b).[3]

## B. *Pretrial Motions*

### 1. *The State's Summary Judgment Motion and Motion for Judgment on the Pleadings*

The State moved for summary judgment in January 2004, asserting that (1) Health and Safety Code section 25180.7 imposed a mandatory duty on certain State employees but not on the State itself, (2) section 25180.7 could not create tort liability because the injuries claimed by plaintiffs were not actionable under the California Tort Claims Act,[4] and (3) the undisputed evidence showed that no Water Board employee violated a mandatory duty to disclose under Health and Safety Code section 25180.7. The trial court denied the State's motion, finding that "[p]laintiffs raise triable material issues of fact, specifically showing that the moving party possessed information requiring it to provide warnings earlier, and to more people, than it did."[5] This court denied the State's ensuing petition for a writ of mandate overturning the trial court's decision, without issuing a written opinion.

---

[3] The pertinent provision, which was enacted as part of Proposition 65, reads as follows: "Any designated government employee who obtains information in the course of his or her official duties revealing the illegal discharge or threatened illegal discharge of a hazardous waste within the geographical area of his or her jurisdiction and who knows that the discharge or threatened discharge is likely to cause substantial injury to the public health or safety must, within 72 hours, disclose that information to the local Board of Supervisors and to the local health officer." (Health & Saf. Code, § 25180.7, subd. (b).)

[4] Government Code section 810 et seq.

[5] The trial court decided the motion without considering the State's principal declaration in support of it. The trial court excluded in its entirety the declaration of Water Board executive officer, Susan Warner, upon the sole ground that she failed to include a recitation that she had personal knowledge of the matters stated therein. It was evident from the declaration that Warner did have personal knowledge of the matters discussed in it.

In July 2005, the State reiterated the purely legal arguments raised in its summary judgment motion by means of a motion for judgment on the pleadings. In addition, the State asserted one new legal argument—that it was immune from liability under Health and Safety Code section 25400, subdivision (b).[6] The court, with a different judge presiding, denied that motion as well.

### 2. *OCLI's Summary Judgment Motion*

OCLI also moved for summary judgment, arguing among other things that there was no evidence it had ever sent hazardous wastes to the Frances Street or Briggs Avenue sites. OCLI relied on the declaration of Ken Pietrelli, a company vice-president, acknowledging that OCLI had sold empty scrap drums and drums containing scrap metal to West Coast Metals—one of the scrap metal dealers leasing the sites in the 1960's and 1970's—but denied that OCLI had ever sent or disposed of any drums containing chemicals to West Coast Metals. In opposition, plaintiffs sought judicial notice of the 1990 and 1992 Water Board staff memos recounting information provided by the anonymous tipster and by David Kessler. Over OCLI's hearsay objection, the trial court (1) took judicial notice of the existence of the documents, and (2) denied OCLI's motion for summary judgment.

### 3. *OCLI's In Limine Motions*

As the trial date approached, OCLI made a number of in limine motions. OCLI moved to exclude as double hearsay all mention of the 1990 and 1992 Water Board internal memoranda. In opposition to these motions, plaintiffs merely asserted in one sentence that the challenged documents "have been admitted by Court." In support of that proposition, plaintiffs attached the order made in connection with OCLI's summary judgment motion, in which a different trial judge had granted plaintiffs' request that it take judicial notice of the memoranda's existence. Notwithstanding the earlier ruling, the court granted OCLI's motions in limine as to these memos on April 11, 2006.

OCLI also moved before trial to exclude evidence that the groundwater beneath its own facility was contaminated, on the ground that such evidence was irrelevant to whether it improperly disposed of hazardous waste offsite, and was unduly prejudicial under Evidence Code section 352. Plaintiffs

---

[6] Health and Safety Code section 25400, subdivision (b) states in relevant part: "[A] public entity . . . shall not be liable for any injury or property damage caused by an act or omission taken by . . . a person authorized by a public entity . . . acting within the scope of employment to abate or attempt to abate hazards reasonably believed to be an imminent peril to public health and safety caused by the discharge, spill, or presence of a hazardous substance, unless the act taken or omission was performed in bad faith or in a grossly negligent manner."

argued that the evidence was relevant to proving that OCLI was the source of the contamination found at Frances Street since the chemicals found at the two locations were assertedly identical. The trial court found the evidence to be inadmissible under Evidence Code section 352.

### 4. OCLI's First Motion to Dismiss

After the court granted OCLI's in limine motions, OCLI moved to dismiss the case against it, arguing that the court's rulings had excluded the only evidence of its liability. In response, plaintiffs argued that the following evidence, to be adduced at trial, would be sufficient to support an inference that chemicals originating at OCLI had found their way into the groundwater underneath the Frances Street and Briggs Avenue sites: (1) Ken Pietrelli's admission in his declaration in support of OCLI's summary judgment motion that OCLI had delivered used drums to West Coast Metals during the 1960's and 1970's; (2) the opinion of plaintiffs' expert, Dr. Lorne Everett, based on an April 1988 OCLI environmental report, that the chemical solvents OCLI had formerly used were consistent with those discovered at the Briggs Avenue and Frances Street sites—including TCE, freon 113, and acetone;[7] (3) Dr. Everett's anticipated testimony that this mixture of chemicals is rare and somewhat unique to the industrial activity that occurred at OCLI; (4) a 1988 Water Board report stating that 55-gallon drums containing hazardous chemicals had been found at the sites; and (5) the asserted fact that OCLI could not identify any other possible source for the contamination found at the sites.

The trial court "reluctantly" denied OCLI's motion to dismiss without prejudice to OCLI's raising the same issues by way of a motion for nonsuit at the appropriate time. The court explained that it would feel more comfortable deciding the issues after plaintiffs had a chance to put in all of their admissible evidence concerning OCLI.

### C. The Mistrial

Before trial commenced, Union Pacific had filed a motion in limine precluding any party in the liability phase of the trial from referring to plaintiffs' alleged damages, including their chemical exposure level, medical conditions, or the extent or nature of their personal injuries or property damage (hereafter MIL No. 1). Union Pacific's proposed order on MIL No. 1 included a provision that if plaintiffs violated the order and a mistrial

---

[7] The 1988 environmental report suggested that at least some of these chemicals were stored in drums at various locations in the OCLI facility, as were other materials. According to the Pietrelli declaration, OCLI sold only drums that had been used to hold scrap metal to West Coast Metals.

resulted, the court shall "impose a monetary sanction upon Plaintiffs' counsel in an amount equaling the cost of [Union Pacific's] attorneys' fees incurred from the date the trial commences to the date of any mistrial."

Plaintiffs opposed both the substantive and sanctions provisions of the proposed order. The trial court granted MIL No. 1, subject to the qualification that plaintiffs would be allowed to introduce evidence during the liability phase that their wells were contaminated. This ruling came in response to plaintiffs' argument that some evidence of harm had to be allowed because harm was an element of their negligence liability causes of action against defendants. The court accordingly modified the written order submitted by Union Pacific to allow evidence that plaintiffs' wells had been contaminated. At the hearing on the motions, the State requested that it also be awarded attorney fees as sanctions if plaintiffs violated the proposed order. Without being more specific, the court responded that the order on MIL No. 1 (hereafter In Limine Order No. 1) would "apply to everybody in the case." However, the court made no change in the wording of the submitted order to broaden its application in any respect.

After the trial began, plaintiffs' counsel and witnesses violated a series of in limine and other pretrial court orders, culminating in the declaration of a mistrial before plaintiffs were able to complete their case-in-chief. Plaintiffs' counsel first clashed with the court during jury selection on May 9, 2006, by bringing a visibly disabled minor plaintiff to the courthouse and positioning him in front of the jury panel as they entered the courtroom. This violated an in limine order generally excluding minors from the courtroom. On May 10 and 11, while under questioning by plaintiffs' counsel, Dr. Everett offered testimony on three occasions that violated in limine orders and drew objections.

On May 16, plaintiffs' counsel, Keith Robinson, who was already on notice of the court's heightened concern about violations of its orders, began asking one of the plaintiffs about the fact that she had to begin paying for water from the city after her well was found to be contaminated. Union Pacific's counsel objected based on In Limine Order No. 1 and the parties held an unreported sidebar conversation. As soon as the parties went back on the record in the presence of the jury, Robinson asked the witness whether she had suffered harm or loss from having to buy the city's water. This further violation of In Limine Order No. 1 drew an immediate objection from Union Pacific's counsel. The trial court sustained the objection, excused the jury for the day, and informed Robinson in strong terms that the court was out of patience with his violation of its orders, and that he seemed to be deliberately inviting

a mistrial as well as a citation for contempt. Robinson apologized for his question and the court accepted his apology. At the same time, the court warned Robinson to be "very, very careful" because the cumulative prejudice from violating the court's orders was starting to reach the level where a mistrial might be required, at which point counsel would owe the opposing parties a large amount of money "because that's the order of the Court."

On May 23, 2006, the court warned Robinson during a colloquy that the next time he asked a question that invited a witness into an area covered by a motion in limine he would be risking a mistrial, contempt citation, and an attorney fee sanctions award under In Limine Order No. 1. The last straw for the court occurred the next day during the examination of Kenneth Pietrelli by Robinson's cocounsel, Charles Cochran. Cochran asked Pietrelli about the Water Board's investigation of OCLI's disposal practices, an area that the court had specifically declared off limits in an oral ruling made on May 9. At that point, the court invited the defense to bring an oral motion for a mistrial, which they did. All of the defendants also joined in an oral motion for an award of fees against plaintiffs' counsel pursuant to In Limine Order No. 1. The court granted both motions and set a date for a hearing on the amount of defendants' fees and costs. In making these rulings, the court observed that it had "never seen a case where the court's orders were so blatantly disobeyed."

Before the date set for the hearing, defendants submitted a letter to the court calling its attention to issues regarding a trial court's authority to award attorney fees as sanctions in connection with a mistrial. The letter proposed that the parties be given an opportunity to brief the issue of attorney fees as sanctions, and further advised that defendants would be asking the court to reconsider its rulings on their prior dispositive motions. At the hearing, the trial court (1) informed Robinson and Cochran that it was going to cite them for contempt, (2) invited defendants to bring their own motions for sanctions under section 128.7 and In Limine Order No. 1, (3) advised that on its own motion it was going to reconsider its rulings on the State's motion for summary judgment and OCLI's motion to dismiss, and (4) set a briefing schedule and combined hearing date for the order to show cause regarding contempt and other motions. Union Pacific and OCLI filed separate motions for sanctions, and OCLI and the State also joined in Union Pacific's motion based on In Limine Order No. 1. OCLI filed a renewed motion to dismiss and the State filed a renewed motion for summary judgment.

D. *The Court's Postmistrial Rulings*

Following a hearing held on August 18, 2006, the trial court made the following rulings: (1) sanctions for attorney fees and costs were appropriate as to all defendants under In Limine Order No. 1; (2) fees and costs were

recoverable jointly and severally from Cochran, Robinson and Gonzalez & Robinson in the amounts of $588,307.71 for Union Pacific, $419,608.80 for OCLI, and $143,124.74 for the State; (3) OCLI's award also included sanctions under section 128.7 because the case against it lacked evidentiary support; (4) OCLI was entitled to the dismissal of plaintiffs' claims against it; (5) the State was entitled to summary judgment; and (6) Cochran and Robinson were found to be in contempt of court.[8]

After its summary judgment motion was granted, the State moved for a further award of its defense costs from the plaintiffs, including expert witness fees, under sections 998 and 1038. The trial court granted the State's motion for defense costs, awarding the State $672,501.25 in attorney fees under section 1038, and $439,535.31 in expert witness fees—jointly and severally against all plaintiffs—under both sections 998 and 1038.

Robinson, Gonzalez & Robinson, and Cochran timely appealed from the sanctions awards (case Nos. A115474 and A115445). Plaintiffs filed separate appeals from the granting of (1) OCLI's motion to dismiss (case No. A115399); (2) the State's motion for summary judgment (case No. A116164); and (3) the State's motion for defense costs (case No. A116901). We consolidated the five appeals.

## II. DISCUSSION

A. *Fee Awards Based on In Limine Order No. 1*

The court found that it had the power to award fees as sanctions under In Limine Order No. 1 on three grounds: (1) its inherent powers under section 187, (2) judicial estoppel in that plaintiffs' counsel did not object to the order after it was made applicable to all parties, and (3) because all of the parties agreed to permit attorney fees as a sanction for causing a mistrial as long as it was applicable to both sides. Plaintiffs' counsel take issue with each stated basis for the court's award.

1. *Court's Inherent Authority*

The trial court believed it had the statutory authority to enforce the attorney fee provision of In Limine Order No. 1 under sections 187 and 128,

---

[8] We reversed the contempt orders and have directed the trial court to take no further action with respect to contempt. (*Robinson v. Superior Court* (Jan. 26, 2007, A115483) [nonpub. opn.] and *Cochran v. Superior Court* (Jan. 26, 2007, A115711) [nonpub. opn.].)

subdivision (a)(4).[9,10] The court reasoned that section 187 gives courts broad inherent powers in complex multiparty cases to fashion new procedures to manage and control the litigation. (See *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1380 [5 Cal.Rptr.2d 882].) In particular, because this case involved complex scientific issues, many parties, and a lengthy phased trial, the court believed it had the inherent power to make orders ensuring that relevant evidence was introduced at the appropriate time and in a nonprejudicial manner. By virtue of section 128, subdivision (a)(4), the court believed it had the power to back up its orders by imposing monetary sanctions, including attorney fees, for their violation.

Plaintiffs' counsel rely primarily on *Bauguess v. Paine* (1978) 22 Cal.3d 626 [150 Cal.Rptr. 461, 586 P.2d 942] (*Bauguess*), which reversed an award of attorney fees imposed as a sanction on an attorney for causing a mistrial. (*Id.* at pp. 633, 640.) The *Bauguess* court in fact held specifically that a court's inherent power to exercise supervisory control over judicial proceedings does *not* include the power to award attorney fees as a sanction for attorney misconduct absent specific legislative authorization or agreement of the parties. (*Id.* at pp. 633–640; see also *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 809 [11 Cal.Rptr.3d 298, 86 P.3d 354] (*Olmstead*) ["*Bauguess* . . . held that trial courts may not award attorney fees as a sanction for misconduct unless they do so pursuant to statutory authority or an agreement of the parties."]; *Trans-Action Commercial Investors, Ltd. v. Firmaterr, Inc.* (1997) 60 Cal.App.4th 352, 371–373 [70 Cal.Rptr.2d 449] (*Trans-Action*) [in partial reliance on *Bauguess,* invalidating rule of court that permitted courts to impose attorney fees in situations not specifically authorized by statute].)

The rationale for the Supreme Court's holding in *Bauguess* was that allowing the trial courts to impose attorney fees as sanctions for attorney misconduct without statutory protections would undermine due process and threaten the independence of the bar: "It would be both unnecessary and unwise to permit trial courts to use fee awards as sanctions apart from those situations authorized by statute. If an attorney's conduct is disruptive of court processes or disrespectful of the court itself, there is ample power to punish the misconduct as contempt. Moreover, unlike the power advocated by respondent, a court's inherent power to punish contempt has been tempered

---

[9] "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code." (§ 187.)

[10] Section 128, subdivision (a)(4) provides in relevant part: "(a) Every court shall have the power to . . . [¶] . . . [¶] (4) . . . compel obedience to its judgments, orders, and process, and to the orders of a judge out of court, in an action or proceeding pending therein."

by legislative enactment to provide procedural safeguards. [Citations.] Among these safeguards is the opportunity, in cases where the contempt occurs out of the immediate view and presence of the court, to disqualify the judge . . . . Additionally, the Legislature has limited the penalty for civil contempt to five days in jail and a $500 fine. [Citations.] Absent such safeguards, serious due process problems would result were trial courts to use their inherent power, in lieu of the contempt power, to punish misconduct by awarding attorney's fees to an opposing party or counsel. [¶] The use of courts' inherent power to punish misconduct by awarding attorney's fees may [also] imperil the independence of the bar and thereby undermine the adversary system." (*Bauguess, supra,* 22 Cal.3d at pp. 637–638.)

█ As an initial matter, we note that the trial court in this case held that *Bauguess* had been superseded by the enactment of section 128.5 and was no longer controlling. We do not agree with the court's analysis. Section 128.5, which authorizes the imposition of monetary expense sanctions, including attorney fees, for bad faith "actions or tactics," was superseded for actions filed on or after January 1, 1995, by section 128.7. The latter statute provides a more limited authorization for the imposition of fees as sanctions for the filing of improper signed pleadings. (*Id.,* subd. (a).) Although it is true that the Legislature enacted section 128.5 to broaden the power of trial courts to award monetary sanctions in response to *Bauguess* (see *Olmstead, supra,* 32 Cal.4th at p. 809), the statute only superseded *Bauguess* and supplied legislative authorization for the type of fee award invalidated in the *Bauguess* case for cases filed within the limited time window during which it was in effect, i.e., between 1982 and 1994. Rather than undermining *Bauguess,* the adoption of section 128.5 shows the Legislature's acceptance of its core holding that trial courts may not award attorney fees as a sanction for misconduct absent statutory authority (or an agreement of the parties). *Bauguess*'s continued viability is shown by its application after the adoption of section 128.5. (See *Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697 [71 Cal.Rptr.3d 207] [reversing fee award against attorney for misleading communication with prospective class members]; *Trans-Action, supra,* 60 Cal.App.4th at pp. 365–366.)

█ Sections 128.5 and 128.7 plainly do not authorize the fee awards made in this case to the extent they are based on counsel's asserted violation of In Limine Order No. 1. Section 128.5 has no application to cases filed on or after January 1, 1995, while section 128.7 applies solely to attorney misconduct in the filing or advocacy of groundless claims made in signed pleadings and other papers. (§ 128.7, subd. (b).) Equally, sections 128, subdivision (a)(4) and 187, relied upon by the court, cannot supply the type of statutory authorization required under *Bauguess.* █ These generic statements of the court's powers to formulate suitable procedures and command obedience to its orders do not by their own terms authorize any specific

form of attorney sanction, much less impose the type of procedural safeguards that the *Bauguess* court found essential.

■ Defendants rely on *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736 [66 Cal.Rptr.3d 268] (*Slesinger*), a case that distinguished *Bauguess* and *Trans-Action* in upholding the trial court's inherent authority to impose terminating sanctions for egregious discovery abuses. (*Slesinger*, at pp. 762, 764, fn. 19.) Defendants argue that if a court has the inherent authority to dismiss a case in appropriate circumstances, it must also have the authority to include fee-shifting provisions in its pretrial orders to encourage compliance with those orders. But *Slesinger* involved extreme discovery abuse by a party, including the theft of confidential and privileged documents. (*Id.* at pp. 741–756.) Under those circumstances, where any sanction short of dismissal would have deprived the opposing party of a fair trial, the *Slesinger* panel found that the trial court did have the inherent power to dismiss. (*Id.* at pp. 762–763, 764.) In support of its position, the panel cited statutory language in which the Legislature had expressly acknowledged the inherent power of courts to dismiss. (*Id.* at p. 763, citing §§ 581, subd. (m), 583.110.) In contrast, citing *Bauguess* and *Trans-Action*, the *Slesinger* court was careful to point out that the "inherent authority to sanction for egregious misconduct does *not* include the power to award attorney fees to punish that misconduct." (155 Cal.App.4th at p. 764, fn. 19, italics added.) Thus, *Slesinger* directly refutes defendants' argument that the court had the inherent power to impose attorney fees as a sanction for violating In Limine Order No. 1.

Defendants also argue that *Bauguess* is inapplicable because, unlike that case, the fees here were imposed for violation of a *pretrial* court order. According to defendants, the issue of whether the court had the authority to enter an in limine order with a fee-shifting provision *prior* to trial, and to enforce such pretrial order, was not addressed in *Bauguess* and related cases. Here, unlike *Bauguess*, the issuance of the pretrial order gave counsel ample notice that fees could be awarded for causing a mistrial.

Defendants' narrow reading of *Bauguess* makes little sense. If a court could grant itself the power to award fees as sanctions merely by issuing a pretrial order, much of *Bauguess*'s reasoning would have to be cast aside. The *Bauguess* court began its analysis of the court's inherent powers to award fees as sanctions from the premise that our courts normally follow the traditional "American rule" that each side bears its own attorney fees, and that nonstatutory departures from that practice have been recognized only infrequently "after careful analysis and a finding that compelling reasons of public policy warranted such an award." (*Bauguess, supra*, 22 Cal.3d at pp. 634–636.) Allowing courts to freely suspend or displace the traditional

rule by pretrial order—with no comparable analysis or findings—would seem to clash directly with that premise. Further, the *Bauguess* court was concerned that court-crafted sanctions would lack the " 'appropriate safeguards and guidelines developed following a thorough in-depth investigation' " that only the legislative process could provide. (*Id.* at p. 639, quoting *Young v. Redman* (1976) 55 Cal.App.3d 827, 838–839 [128 Cal.Rptr. 86].) Again, holding that a court may give itself the ad hoc authority to impose fee shifting as a sanction without safeguards or guidelines seems flatly inconsistent with *Bauguess*'s reasoning.

For these reasons, we hold that the trial court's award of attorney fees against plaintiffs' counsel for their asserted violation of In Limine Order No. 1 was neither within the court's inherent powers nor authorized by statute.

### 2. *Judicial Estoppel and Agreement of the Parties*

The trial court also believed it could impose the sanctions award based on judicial estoppel and agreement of the parties because plaintiffs' counsel assertedly requested and the court agreed that the order would be made applicable to all parties. We do not believe that the record in this case supports either theory.

Plaintiffs' counsel submitted written opposition to MIL No. 1, including its sanctions provision. Plaintiffs' position was understandable. Union Pacific had made no secret of the fact that the motion and sanctions provision were aimed exclusively at plaintiffs. The motion's stated objective was to restrain *plaintiffs* from introducing evidence that Union Pacific considered to be highly prejudicial, although the proposed order itself precluded such evidence from being admitted without regard to the party offering it. For its part, the proposed sanctions provision addressed only one possible scenario—Union Pacific's recovery of its fees from plaintiffs' counsel in the event the latter violated the order and a mistrial was declared.

It is true that the issue of the order's one-sidedness in favor of Union Pacific did come up at the hearing on the parties' in limine motions. However, this issue was only raised several minutes *after* the trial court had in fact already granted Union Pacific's motion, and it was raised by the State, not by plaintiffs.[11] At that time, the following colloquy occurred:

"[Counsel for the State]: Also, again, not to retrace steps, but we joined in [MIL No. 1]. And in Union Pacific's motion . . . one of the remedies they

---

[11] At plaintiffs' request, and with the concurrence of all parties, the trial court had by that time already agreed to modify the proposed in limine order to clarify that evidence of well contamination could be introduced.

asked for was their attorneys fees and a mistrial if plaintiffs violated that motion. I just want to make clear that when the Court issues its ruling, that we're included in that, too. And if a mistrial occurs because of misconduct by plaintiffs in bringing in damages issues or other second phase issues . . . we would like to . . . recover our attorneys fees as well.

"[The Court]: Well, just to clarify, in terms of the orders that the Court's going to impose, it's going to be plaintiffs shall be precluded, or defense shall be precluded from bringing up this evidence. Because it happens to be your motion or OCLI's motion or [Union Pacific's] motion or the plaintiffs' concern, that's going to apply to everybody in the case.

"[*Plaintiffs' Counsel*]: *Well, shouldn't the preclusion orders not just be plaintiffs, but also be defendants are precluded from—*

"[The Court]: Oh, absolutely." (Italics added.)

Despite the court's comments during this colloquy, the only written modification the court made to Union Pacific's proposed order was to add some handwritten language allowing plaintiffs to introduce evidence of well contamination.

A number of conclusions may be drawn from this record. First, contrary to defendants' contention, plaintiffs never requested that In Limine Order No. 1 be modified to provide that plaintiffs could obtain their fees if a defendant violated the order and caused a mistrial. The State was the only party to request that the sanctions provision be broadened to cover parties other than Union Pacific. Its request was *not* that the sanctions clause be reciprocal between plaintiffs and defendants, but only that it operate in favor of the State as well as Union Pacific. Plaintiffs' counsel offered one comment during this colloquy. That comment did not refer to the sanctions provision of In Limine Order No. 1 nor was it even directed to that order in particular. Plaintiffs simply requested that all of the preclusion orders being entered that day preclude defendants as well as plaintiffs from introducing prohibited evidence. The court readily agreed to that but, as to In Limine Order No. 1 at least, no change was necessary to the proposed order because Union Pacific had already drafted it to bar any party from introducing damages evidence during the liability phase of the trial.

Second, plaintiffs never agreed that the order would be acceptable if it allowed them to recover their fees in the event one of the defendants caused a mistrial. Nothing in the record shows that such a proposal was ever initiated by or put to plaintiffs' counsel, or that counsel ever accepted it.

Third, the trial court never in fact indicated on the record that it was modifying Union Pacific's proposed In Limine Order No. 1 to reflect the type

of reciprocal sanctions clause that defendants claim plaintiffs sought or accepted. The court never responded on the record to the substance of the State's request that the sanctions clause cover the State's attorney fees, never stated that it intended to widen the scope of the sanctions clause to apply in favor of all parties, and never changed the written order to reflect any such modification even though it did modify that order in another respect agreed to by the parties.

■ Fourth, even assuming contrary to the record that plaintiffs' counsel's italicized comment *ante* may plausibly be taken as an implied request that the sanctions clause be made reciprocal, that would still not establish plaintiffs' acquiescence in the remedy. Faced with an objectionable order, a party may act "defensively to lessen the impact of the error" without waiving it for purposes of appellate review. (*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 857 [176 Cal.Rptr. 239]; see also *Park City Services, Inc. v. Ford Motor Co., Inc.* (2006) 144 Cal.App.4th 295, 311 [50 Cal.Rptr.3d 373] [attorney who properly objects to an erroneous ruling does not waive the error by endeavoring to make the best of a bad situation for which he was not responsible].) In this regard, plaintiffs' counsel cite the somewhat analogous case of *Levine v. Pollack* (1995) 37 Cal.App.4th 129 [43 Cal.Rptr.2d 491]. There, the trial court advised the plaintiff that it would grant her request for a continuance of the trial only on the improper condition that she agree to pay the defendants' attorney fees for trial preparation. (*Id.* at p. 132.) The plaintiff reluctantly agreed, believing she had no choice in the matter. (*Ibid.*) Upon the plaintiff's appeal from a later order awarding fees against her, the Court of Appeal rejected the defendants' argument that the plaintiff was estopped by her agreement from objecting to the fees. The plaintiff's comments did not operate as an estoppel, according to the appellate court, because her agreement was made reluctantly and in the mistaken belief that the court had the authority to order the fees as condition for a continuance. (*Id.* at p. 139.)

Since the sanctions provision of In Limine Order No. 1 was unauthorized by statute and not within the court's inherent authority, and because there is no plausible evidence in the record that plaintiffs' counsel ever agreed to the provision or forfeited objection to it by estoppel, we will reverse the three attorney fee awards defendants obtained based on that order.[12]

---

[12] We do not reach plaintiffs' counsel's further arguments that (1) the court's after-the-fact finding of an agreement regarding fees violated plaintiffs' due process rights; (2) Attorney Cochran was not bound by any purported agreement by Attorney Robinson to a reciprocal sanctions clause; (3) on its own terms, In Limine Order No. 1 did not authorize the fee awards made because the mistrial did not arise from its violation; and (4) the sanctions awarded under In Limine Order No. 1 must fail because the trial court abused its discretion in declaring a mistrial.

## B. *OCLI Dismissal*

Plaintiffs contend that the trial court committed the following prejudicial errors in granting OCLI's renewed motion to dismiss: (1) excluding the anonymous tipster and Kessler memos written by Water Board staff, (2) excluding evidence of the contamination found at OCLI's own facility, and (3) failing to recognize that even without the excluded material plaintiffs had sufficient evidence to support a jury verdict against OCLI.[13] Although the issue is a close one, we agree with plaintiffs on the latter point as discussed *post,* and will reverse the judgment in OCLI's favor. For the guidance of the trial court on remand, we begin with the evidentiary issues plaintiffs have raised.

### 1. *The Tipster and Kessler Memos*

Plaintiffs argue on appeal that the two Water Board memos recounting staff's 1990 contacts with an anonymous tipster and David Kessler's 1992 telephone call were admissible under Evidence Code sections 1230 and 1280, notwithstanding their double-hearsay character.[14,15] Plaintiffs maintain that the outer layer of hearsay—the out-of-court written statements made by the Water Board staffers when they created the memos—were admissible as official records under section 1280, while the inner layer of hearsay—the out-of-court oral statements made by the tipster and Kessler as reported in the memos—were admissible as declarations against interest under section 1230.

Based on the record, it appears that plaintiffs would have been able to establish the foundational elements for the official records exceptions to apply had they been given an opportunity to do so. The authors of the memos,

---

[13] Plaintiffs also argued that the trial court erred by not "allowing" them to conduct additional discovery before deciding OCLI's renewed motion to dismiss. In our view, plaintiffs did not need the court's permission to conduct discovery since the declaration of mistrial automatically reopened discovery. (See *Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245, 247 [92 Cal.Rptr.2d 70, 991 P.2d 156].) In any event, this issue is mooted by our reversal of the judgment in OCLI's favor.

[14] Evidence Code section 1230 provides in relevant part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

[15] Evidence Code section 1280 provides in pertinent part: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered . . . to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Christine Wright-Shacklett and Susan Warner, both testified at trial. OCLI's trial counsel never disputed that the preparation of these memos was part of Warner's and Wright-Shacklett's official duties, that the documents were prepared close in time to the events described, or that Warner and Wright-Shacklett were reliable record keepers. Thus, the primary issue on appeal concerned the inner layer of hearsay—whether the statements by the tipster and Kessler as recorded in the memos could be offered for their truth.

### a. *The Tipster Memos*

■ As an initial matter, plaintiffs waived their Evidence Code section 1230 argument concerning the tipster memos by failing to raise it in the trial court. In response to OCLI's motion in limine to exclude the memos, plaintiffs argued that the documents had already been admitted because the trial court had taken judicial notice of their existence. Later, plaintiffs filed a second opposition in which they argued the memos were admissible as business records under Evidence Code section 1271. At no time did plaintiffs claim that the tipster memos should be admitted under Evidence Code section 1230. Plaintiffs may not pursue a new theory of admissibility on appeal unless the factual record surrounding it has been fully developed. (*American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 [241 Cal.Rptr. 466].) The facts pertaining to the possible applicability of this hearsay exception were never fully developed in the trial court because plaintiffs did not invoke it and did not attempt to make—nor did OCLI have an opportunity to fully contest—the preliminary fact showing required. (See Evid. Code, § 405; *People v. Chapman* (1975) 50 Cal.App.3d 872, 879 [123 Cal.Rptr. 862].)

Even assuming for the sake of analysis that plaintiffs timely raised the issue and the trial court decided it adversely to them, we would find no abuse of discretion based on the record before us. (See *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456 [134 Cal.Rptr.2d 756] [in limine rulings reviewed for abuse of discretion].)

■ The proponent of a declaration against interest must show that (1) the declarant is unavailable, (2) the declaration was against the declarant's penal interest when made, and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Lucas* (1995) 12 Cal.4th 415, 462 [48 Cal.Rptr.2d 525, 907 P.2d 373].) The reliability determination may take into account the circumstances under which the statement was made and the possible motivations of the speaker. (*Ibid.*) Moreover, Evidence Code section 1230 is " 'inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' " (*People v. Duarte* (2000) 24 Cal.4th 603, 612 [101

Cal.Rptr.2d 701, 12 P.3d 1110].) Thus, the hearsay exception does not apply to collateral assertions within declarations against penal interest. (*Ibid.*)

First, the trial court would not have abused its discretion in finding that statements by an anonymous tipster fail to satisfy the fundamental requirement of a declaration against interest—that the declarant actually believes himself to be at some significant risk of civil or criminal liability when he makes the statement sought to be admitted. Many cases have rejected declaration against interest claims on this ground. (See *Singh v. Woodford* (N.D.Cal., Feb. 22, 2005, No. C 04-02962 CRB) 2005 U.S.Dist. Lexis 4126, pp. *26–*27 [exception does not apply to anonymous and unidentifiable caller confessing to crime]; *State v. Kiser* (Tenn.App., Nov. 29, 2007, No. E2005-02406-CCA-R3-DD) 2007 Tenn.Crim.App. Lexis 890, pp. *125–*126 [anonymous caller's statements were inadmissible because the caller, thinking he would not be discovered, did not believe he was subjecting himself to any criminal liability]; *U.S. v. Burks* (C.M.A. 1993) 36 M.J. 447, 451, fn. 2 ["A 'confession' by one who speaks from the shadows and remains unidentifiable hardly measures up to the rationale that a statement made against the declarant's own interests is, therefore, reliable."]; *State v. Tucker* (1992) 331 N.C. 12 [414 S.E.2d 548, 555] [anonymous letter does not actually subject the declarant to criminal liability because a declarant who conceals his identity does not tend to expose himself to criminal liability]; *Commonwealth v. Watson* (1994) 36 Mass.App.Ct. 252 [629 N.E.2d 1341, 1343–1344] [anonymous informant's statement that he purchased drugs from the defendant does not gain credibility as a statement against his penal interest since there is no reason to believe he would realistically have feared prosecution for the offense]; *Commonwealth v. Lewis* (1977) 472 Pa. 235, 242 [372 A.2d 399] [anonymous calls confessing to murder not admissible as declarations against penal interest].)

It is true, as plaintiffs point out, that the tipster in this case took a greater risk by meeting face-to-face with Water Board staff than by simply by calling in his information. And, according to the staff memos, he did express concern about his potential criminal liability. But the declarant did insist on and succeed in maintaining his anonymity. We cannot say that it would have been an abuse of discretion to give decisive weight to this factor in determining whether the tipster reasonably believed his statement would lead to actual legal detriment when he made it.[16]

---

[16] Plaintiffs cite cases holding that information told to police officers by an anonymous tipster in a face-to-face meeting is considered more reliable than that obtained from an anonymous telephone tip for purposes of establishing probable cause or reasonable suspicion sufficient to support a search warrant or traffic stop. (See, e.g., *U.S. v. Valentine* (3d Cir. 2000) 232 F.3d 350, 354–355.) One rationale for this rule is that a person who meets with the police has greater reason to fear being identified and prosecuted for making a false police report.

Second, even if the tipster's identity had been known, the trial court would not have abused its discretion in excluding as collateral those portions of his statement that identified OCLI as the source of the barrels. While those statements were arguably against OCLI's interest, they were not against the declarant's. The only part of his statement that would have exposed *him* to liability was his admission that he put a pick through the barrels and dumped their contents on the ground. His identification of OCLI was arguably merely collateral to that admission, and not " 'specifically disserving to the interests of the declarant.' " (*People v. Duarte, supra,* 24 Cal.4th at p. 612.) Thus, even if the tipster memos had been admissible, the trial court would have acted within its discretion in redacting those portions that referred to OCLI as the source of the barrels.

For these reasons, the trial court properly excluded the tipster memos.

### b. *Kessler Memo*

Plaintiffs claim that the trial court further erred in failing to admit the handwritten 1992 Water Board memo containing notes of a telephone conversation between a Water Board staff member and Donald Kessler, the deceased former owner of an auto wrecking yard that had leased the Briggs Avenue site. The notes state in relevant part: "He said that drums were either picked up or delivered to the site from OCLI. He said the drums were supposed to be empty because they were used for storage of metal waste onsite. He said chances are there was liquid at times in the drums. He said he had employees that weren't always paying attention to the matter." Plaintiffs argued in the trial court that Kessler's statements to the employee during the call, as recorded by the employee, were admissible for their truth as declarations against Kessler's interest under Evidence Code section 1230.[17]

Kessler's statements as reported do not qualify as declarations against interest because they are, if anything, intended to be exculpatory rather than inculpatory as to Kessler himself. Kessler stated that the drums were "supposed to be empty" when he got them from OCLI. In other words, Kessler's

---

However, these cases do not involve either self-incriminating statements by tipsters or the declaration against interest exception to the hearsay rule. We do not find them particularly persuasive in deciding, for purposes of Evidence Code section 1230, what weight to give to the fact that the tipster in this case agreed to meet with the staff of a civil administrative agency.

[17] OCLI argues that plaintiffs waived the declaration against interest theory by mentioning it only in passing at oral argument before the trial court without making any attempt to further develop it. In our view, plaintiffs have preserved this issue for appellate review, if only barely. In addition to the comment made at oral argument, plaintiffs attached their earlier-filed request for judicial notice of the Kessler memo as part of their opposition to the motion in limine. That request included an argument that the memo was admissible notwithstanding the hearsay rule based on Evidence Code sections 1230 and 1280.

agreement with OCLI was that OCLI was to dispose of any contents the drums had once held before the drums arrived at Kessler's site. Despite this agreement, "chances are" there was "liquid" in them "at times," according to Kessler. This was apparently due to the fact that some of Kessler's employees did not "always pay[] attention," implying that he had instructed the employees to make sure the drums were empty. Kessler does not say whether the "liquid" had any relationship to the contamination found at the site or was something harmless, such as rainwater. His statements suggest that the quantity of liquid involved was small.

 Kessler's statements are those of a person who is trying to avoid rather than assume liability for any contamination that OCLI's drums might have caused. According to Kessler, there was no deliberate dumping. Any spillage that did occur was infrequent, inadvertent, and came about only through the combined fault of others—OCLI's leaving liquid in the drums contrary to its agreement with him and his employees' neglecting to follow the directions he had given them to make sure the drums were empty. Rather than disserving his own interests, Kessler's statements appear, if anything, to be an attempt to shift the blame to OCLI. At the time of this telephone conversation, Kessler had already been named as a responsible party by the Water Board in a cleanup and abatement order so he had every reason to implicate others in order to reduce his share of the remediation costs. In that context, nothing about the statements provided any guarantee of their reliability, which is the basis for the declaration against interest exception. (See *People v. Duarte, supra,* 24 Cal.4th at p. 612 ["Even a hearsay statement that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect."].)

Accordingly, the trial court did not abuse its discretion in excluding the 1992 Water Board memo. (*People v. Lawley* (2002) 27 Cal.4th 102, 153 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

### 2. *Contamination Found at OCLI's Facility*

OCLI moved successfully before trial under Evidence Code section 352 to exclude mention of any groundwater contamination at its own Santa Rosa facility as tending to create a danger of undue prejudice, or of misleading or confusing the jury.[18] OCLI further sought to preclude plaintiffs from making any argument that OCLI had a propensity to improperly dispose of chemicals. Plaintiffs filed no written opposition, but argued at the hearing that the

---

[18] Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

evidence was relevant to show that OCLI took such poor care of the chemicals it used that it had contaminated the groundwater under its own site. The trial court ruled that the proposed evidence was inadmissible under section 352.

On appeal, plaintiffs argue that the evidence should have been admitted as habit or custom evidence under Evidence Code section 1105,[19] or as evidence of identity or a common scheme or plan under section 1101.[20] These claims are unavailing. First, plaintiffs waived these theories of admissibility by failing to raise them in the trial court. (*American Continental Ins. Co. v. C & Z Timber Co., supra,* 195 Cal.App.3d at p. 1281.) The only theory plaintiffs did offer at trial—that the evidence showed OCLI took poor care of chemicals—depends on precisely the type of suspect inference that Evidence Code section 1101 is intended to foreclose, namely, that a person's bad conduct in one circumstance shows a propensity to act badly in others.

Second, although plaintiffs argue at some length that Evidence Code section 1101, subdivision (a) does not apply to corporations, they fail to cite a single case or authority so holding. In fact, subdivision (a) has been applied to exclude evidence offered against corporations in circumstances completely analogous to those presented here. (See *Marocco v. Ford Motor Co.* (1970) 7 Cal.App.3d 84, 90–92 [86 Cal.Rptr. 526] (*Marocco*) [evidence that car manufacturer negligently failed to discover a defect in one automobile part inadmissible to prove negligence pertaining to an unrelated part]; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 850–851 [139 Cal.Rptr. 888] (*Brokopp*) [same].)

Third, plaintiffs had no evidence of habit or custom to offer, even by their own definition of these terms. Plaintiffs point out that a person's "habit" is his regular response to a repeated specific situation, while the term "custom" refers to the routine practice of a group or organization that is equivalent to the habit of an individual. (*People v. Memro* (1985) 38 Cal.3d 658, 681, fn. 22 [214 Cal.Rptr. 832, 700 P.2d 446].) Plaintiffs had no evidence whatsoever of OCLI's chemical waste disposal practices at its Santa Rosa facility. They sought to use evidence of contamination as evidence that OCLI's practices,

---

[19] Evidence Code section 1105 provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."

[20] Evidence Code section 1101 states in relevant part: "(a) Except as provided in this section . . . evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or the] absence of mistake or accident . . .) other than his or her disposition to commit such an act."

whatever they were, must have been careless. From this plaintiffs wanted the jury to infer that OCLI must have also been careless in the manner in which it disposed of its drums containing hazardous wastes at the Frances Street site. This is not habit or custom evidence, but propensity evidence of just the type condemned in *Marocco* and *Brokopp*.

Fourth, absent any evidence about OCLI's practices with regard to chemical waste disposal either at its own site or at Union Pacific's property, the exceptions for proof of identity or common scheme or plan would be inapplicable even if they had not been waived. These exceptions require a showing of distinctive similarities or common features between the two instances of conduct. (See *People v. Diaz* (1992) 3 Cal.4th 495, 562 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Plaintiffs had no such evidence.

The trial court did not err or abuse its discretion in excluding plaintiffs' proffered evidence of groundwater contamination at OCLI's site.

### 3. *Sufficiency of Admitted Evidence*

Plaintiffs (and their trial counsel) argue in the alternative that even if the foregoing evidence was properly excluded, the following *admitted* evidence would have been sufficient to support a jury verdict in plaintiffs' favor: (1) OCLI's facility was two to three miles from the Union Pacific site; (2) OCLI admittedly sent large metal drums to that site on a regular basis in the 1960's and 1970's; (3) OCLI stored its waste chemicals in 55-gallon drums before sending them out for disposal; (4) numerous such drums were found at the Union Pacific site, some of which were leaking hazardous chemicals; (5) the same six chemicals that OCLI used at its facility were also found at the Union Pacific site or in its groundwater; (6) OCLI retained no disposal records pertaining to these chemicals for a 30-month period in the mid-1970's; and (7) there is no evidence in the record of any single source other than OCLI for the particular mix of chemicals contaminating the Union Pacific site.[21]

---

[21] In response to OCLI's original motion to dismiss, plaintiffs also submitted a declaration from Dr. Everett in which he opined, among other things, that the mix of chemicals found in the groundwater was "rare" and that this group of chemicals was "somewhat unique" to the manufacturing activity that occurred at OCLI. The trial court granted OCLI's motion in limine to exclude these opinions because they had not been disclosed at Everett's deposition. It declined to consider Dr. Everett's declaration when it was offered again in opposition to OCLI's renewed motion to dismiss. Because plaintiffs have not claimed error in these rulings, we will not consider Everett's opinions on these points in evaluating the sufficiency of plaintiffs' showing. However, plaintiffs are not precluded from offering competent opinion evidence along these lines on remand as long as OCLI has a reasonable opportunity to fully depose plaintiffs' expert on them before the testimony is offered at trial.

We apply the same standard of review to OCLI's renewed motion to dismiss as we would to an appeal from a successful motion for a nonsuit. OCLI brought its dismissal motions under *Clemens v. American Warranty Corp.* (1987) 193 Cal.App.3d 444 [238 Cal.Rptr. 339], which permits a defendant to move for dismissal after the court grants in limine motions that, in the defendant's view, prevent the plaintiff from proving its case. Such a motion is tantamount to a nonsuit. (See *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 358–359 [44 Cal.Rptr.3d 426]; *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 28 [61 Cal.Rptr.2d 518] (*Edwards*).) "A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is no substantial evidence to support a judgment in the plaintiff's favor." (*Edwards*, at p. 28, italics omitted.) The same rules apply on appeal from the granting of a nonsuit. (*Ibid.*) Thus, we must resolve all doubts and draw all legitimate inferences in plaintiffs' favor, and may uphold the judgment for OCLI only if it was required as a matter of law. (*Ibid.*)

Although not particularly strong, plaintiffs' case against OCLI based on the above evidence is sufficient—under the highly favorable standard of appellate review we apply to it—to compel a reversal of the judgment in favor of OCLI. Indulging every legitimate inference that may be drawn from the evidence, a rational jury could conclude that it was not mere coincidence that OCLI used six of the same chemicals that were found to be contaminating the Union Pacific site.[22] While one or two chemicals in common might suggest a coincidence, six in common supports a legitimate inference of a possible causal relationship, especially in the absence of evidence that other nearby sources could account for the same six chemicals.[23] The inference that OCLI played a causal role in the contamination also requires that there be a plausible mechanism by which its waste chemicals could have migrated or been transported to the Union Pacific site. Other evidence established that mechanism. OCLI stored its waste chemicals in 55-gallon drums for disposal. It admittedly transported 55-gallon drums (supposedly empty or containing only scrap metal) to the Union Pacific site on a regular basis during the 1960's and 1970's, and could not account for where it disposed of its wastes for a 30-month period in the mid-1970's.[24] The Water Board ultimately found

---

[22] OCLI disputed plaintiffs' evidence that one of the six chemicals it used—acetone—was found at the Union Pacific site. However, for purposes of appellate review we ignore all such conflicts in the evidence. (*Edwards, supra,* 53 Cal.App.4th at p. 28.)

[23] OCLI disputed the claim that there was no evidence of other possible sources.

[24] OCLI claims that the evidence plaintiffs rely on to establish OCLI's delivery of drums to West Coast Metals in the 1960's and 1970's—the Pietrelli declaration—does not establish the frequency of such deliveries. However, Pietrelli refers in the declaration to OCLI's "dealings

drums like those used by OCLI for storing wastes in large quantities at the site, some observed to be leaking hazardous chemicals. One possible inference from this set of facts is that drums containing hazardous waste were in fact transported from OCLI to the site during at least part of the relevant time period.

Resolving all doubts and indulging all legitimate inferences in plaintiffs' favor, we cannot say that the judgment in favor of OCLI was required as a matter of law. We will therefore reverse it.

## C. *Section 128.7 Sanctions Award to OCLI*

The trial court awarded sanctions to OCLI based both on In Limine Order No. 1 and section 128.7.[25] Regarding the latter, the court explained its decision in relevant part as follows: "On April 11, 2006 the court granted OCLI's two motions in limine which, according to OCLI, eliminated all evidence supporting Plaintiffs' case against OCLI and the Defendant immediately sent letters to the Plaintiffs' counsel requesting to be dismissed with prejudice. CCP § 128.7 ensures that: [¶] '(2) The claims, defenses, and other legal contentions therein are warranted by existing law . . . . (3) The allegations and other factual contentions have evidentiary support . . . .' [¶] OCLI argues that it should have been dismissed from the suit at the beginning of the trial. OCLI claims that there was not the required evidentiary support which would have demonstrated to the court that OCLI was responsible for contamination of the site. Because the Plaintiffs failed to have the 'evidentiary support' and the pleadings were brought 'primarily for an

---

with West Coast Metals in the 1960's and 1970's," which consisted of West Coast Metals' purchase of "scrap drums and drums containing scrap metal." It may be inferred from this that West Coast Metals obtained regular deliveries of drums from OCLI over that extended time period.

[25] Section 128.7 provides in relevant part as follows: "(b) By presenting to the court, whether by . . . filing . . . or later advocating, a pleading, petition, written notice of motion, or other similar paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, all of the following conditions are met: [¶] (1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. [¶] (2) The claims, defenses, and other legal contentions therein are warranted by existing law . . . . [¶] (3) The allegations and other factual contentions have evidentiary support . . . . [¶] . . . [¶] (c) If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) . . . . [¶] (1) A motion for sanctions under this section shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). Notice of motion . . . shall not be filed with . . . the court unless, within 21 days after service of the motion . . . the challenged paper [or] claim, . . . is not withdrawn . . . ."

improper purpose' sanctions should be assessed against the Plaintiffs [pursuant to section 128.7]. [¶] . . . [¶] The court grants the motion for fees [and] costs in the total amount of . . . $419,608.80 (including CCP 128.7 damages)[] to OCLI . . . . The fees and costs are owed, jointly and severally, by [plaintiffs' attorneys]."[26]

As an initial matter, it is important to clarify the conduct for which the court imposed section 128.7 sanctions. OCLI's sanctions motion emphasized that section 128.7 covered not only the filing of a pleading or similar paper without evidentiary support but also the later advocacy of positions taken in such document. The motion went on to cite as grounds 42 alleged instances of sanctionable conduct occurring after the granting on April 11, 2006, of OCLI's motions in limine. These included written and oral representations made in support of (1) a pretrial motion in limine by plaintiffs, (2) plaintiffs' opposition to OCLI's original motion to dismiss, and (3) a May 2006 request for judicial notice. OCLI also cited plaintiffs' opening statement to the jury and various representations to the court concerning the anticipated testimony of certain former OCLI employees who had not been on plaintiffs' pretrial witness list. In addition, OCLI alleged that the totality of plaintiffs' counsel's pleadings and advocacy since the rulings on OCLI's motions in limine, all in an effort to keep OCLI in the case, justified an award of all of the fees and costs incurred from April 11, 2006, forward.

Section 128.7, subdivision (e) provides that "[w]hen imposing sanctions, the court shall describe the conduct determined to constitute a violation of this section and explain the basis for the sanction imposed." Based on the wording of the trial court's order, and its omission to mention any of the other more specific instances of misconduct cited in the motion, we must assume that the court's intent was to sanction plaintiffs' counsel for the totality of its written and oral advocacy pertaining to OCLI from April 11, 2006, until the mistrial. Thus, in the language of section 128.7, plaintiffs' counsel were being sanctioned for falsely certifying through their oral and written presentations to the court after April 11 that there was still evidentiary support for the complaint's factual allegations against OCLI and that such allegations were not being maintained primarily for an improper purpose after that point.

It is thus apparent that the trial court's award of sanctions against OCLI under section 128.7 depended exclusively on its belief that plaintiffs lacked sufficient evidentiary support for their case to survive a nonsuit. Because we

---

[26] The $419,608.80 figure represented the total amount of fees and costs that OCLI claimed to have incurred between March 30, 2006, and May 24, 2006, the day the mistrial was declared. The court did not specify what part of its award was based on section 128.7 or whether it regarded that section as a separate and independent basis for the entire award.

have reached a different judgment on that point, the court's sanctions award against plaintiffs' counsel under section 128.7 must be reversed. We will not hold that a case supported by enough evidence to sustain a favorable jury verdict either lacked "evidentiary support" or was prosecuted "primarily for an improper purpose" for purposes of that section. OCLI ventures no argument that such a holding would be defensible.

## D. *State's Motion for Summary Judgment*

Upon reconsidering the State's motion for summary judgment on its own motion, the trial court held the State had established as a matter of law that (1) no designated Water Board employee was under a duty in 1988 to give the notice to public officials required by Health and Safety Code section 25180.7, subdivision (b), that "the discharge or threatened discharge [was] likely to cause substantial injury to the public health or safety"; and (2) the State was immune from liability under section 25180.7 in any event, because any failure to give prompt notice after issuance of the 1988 cleanup and abatement order would constitute an "act or omission taken . . . to abate or attempt to abate hazards reasonably believed to be an imminent peril to public health and safety caused by the discharge, spill, or presence of a hazardous substance" for purposes of Health and Safety Code section 25400.

On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

Plaintiffs contended that the cleanup and abatement order the Water Board issued for the Frances Street site in July 1988 "suggested" that the contamination of that site was "likely to cause substantial injury to the public health or safety." However, in alleged violation of Health and Safety Code section 25180.7, subdivision (b), no designated Water Board employees, including its then executive officer, Susan Warner, gave notice of the danger to local public officials until January 1990, when the board learned that groundwater beneath the Frances Street site was contaminated with industrial solvents.

The Water Board's July 1988 cleanup and abatement order reported that Water Board staff had found "numerous *soil* contamination problems" at the Francis Street site. (Italics added.) It noted "[m]any areas of hydrocarbon contamination *in soil*" at the site (italics added), and reported that drums leaking hazardous materials, old batteries, and quantities of shredded metals were piled and scattered around the site. Regarding the threat of water contamination, the order noted that "[t]he site overlies shallow groundwaters

and is located near tributaries to the Russian River." It further stated that the groundwater supported, among other things, domestic and agricultural water supplies. After describing the soil contamination, the proximity of groundwater supplies, and the beneficial uses being made of those supplies, the order drew the following conclusions: "The groundwater contamination[27] threatens the beneficial uses of state waters, including domestic supplies served by areal groundwaters . . . . [¶] The discharge and threatened discharge of said wastes could unreasonably affect water quality and the above described beneficial uses. Threaten[ed] discharges of contaminant were observed in the inspection which could affect public health and resources . . . ."

Plaintiffs contend that the text of the 1988 cleanup and abatement order, by itself, is sufficient to create a triable issue of material fact as to whether Susan Warner or other designated Water Board employees had a duty to give the notices required by Health and Safety Code section 25180.7, subdivision (b), at the time the order was issued. According to plaintiffs, based only on the Water Board's declaration that the waste *threatened* domestic water supplies and *could* affect public health and safety, a jury could infer that Susan Warner believed the pollution was *"likely* to cause *substantial* injury to the public health or safety." (Italics added.) We disagree.

 To be subject to the disclosure duty specified in Health and Safety Code section 25180.7, a designated government employee must have information that an illegal discharge of a hazardous waste has occurred or is threatened, and must know that it is likely to cause substantial injury to the public health or safety. (70 Ops.Cal.Atty.Gen. 130, 136 (1987).)[28] It is not sufficient that the employee " 'should have known' " or had a " 'reasonable suspicion' " of such likelihood. (70 Ops.Cal.Atty.Gen., at p. 135.) In support of summary judgment, Warner averred that until she received a report of solvent contamination in groundwater beneath the Frances Street site in January 1990, she did not know there was any threat of substantial injury to public health or safety. She gave timely notice under Health and Safety Code section 25180.7 at that time.

Although the 1988 cleanup and abatement order had reported that some drums at the site were leaking "hazardous materials," the order made no

---

[27] Despite its use of the phrase "[t]he groundwater contamination," the order made no actual finding of groundwater contamination. It merely found surface, soil, and site conditions that created a *threat* of groundwater contamination sufficient to require the landowner to remove all surface wastes and contaminated soil, and to investigate the extent of any groundwater contamination. Plaintiffs do not contend otherwise.

[28] We have found no case law construing Health and Safety Code section 25180.7, subdivision (b). Opinions of the Attorney General are considered persuasive in the absence of any controlling authority. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 103–104 [61 Cal.Rptr.2d 134, 931 P.2d 312].) Here the Attorney General's opinion is based on a straightforward reading of the statute's text.

explicit finding that there had been a discharge or threatened discharge of a "hazardous waste."[29] Neither did the order make or report any finding that the conditions it described were "likely" to cause "substantial" injury to the public health or safety. The order stated only that the conditions "could affect" public health and resources. By law, cleanup and abatement orders can be issued due to possible effects that do not involve public health. (See Wat. Code, §§ 13050, subds. (*l*), (m), 13304, subd. (a).)

 Plaintiffs' argument based on the cleanup and abatement order is tantamount to a claim that because a person has a serious illness, it is reasonable to infer that the person is likely to die. While death is one possible outcome of a serious illness, without more information there is no reason to believe that it is the most likely outcome. Such an inference could be based on no more than guesswork or speculation. Inferences based on guesswork or speculation are not sufficient to demonstrate the existence of a material fact issue. (*Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1298–1299 [123 Cal.Rptr.2d 924].)

Besides the language of the order itself, plaintiffs cite three tangentially relevant excerpts from the trial testimony of two witnesses—plaintiffs' expert, Dr. Everett, and a Water Board senior engineering geologist, Christine Wright-Shacklett.[30] However, this evidence was not offered in any form as part of plaintiffs' opposition to the State's original summary judgment motion in 2004, nor was it called to the trial court's attention upon the court's reconsideration of the State's summary judgment motion in 2006. We do not disagree that plaintiffs were entitled to use testimony they had elicited at trial in an attempt to defeat the State's summary judgment motion. However, having failed to call that evidence to the attention of the trial court when it reconsidered the State's motion, plaintiffs may not raise it for the first time on this appeal.[31] (See *Jacobs v. Retail Clerks Union, Local 1222* (1975) 49

---

[29] The term "hazardous waste" is defined in Health and Safety Code section 25117. The word "waste" is defined in Health and Safety Code section 25124 and in Water Code section 13050, subdivision (d).

[30] Dr. Everett testified that in his experience the language used in the cleanup and abatement order was not the type of language that would be used if the Water Board believed there was no "offsite contamination." Wright-Shacklett testified under questioning by plaintiffs' counsel that she worked on the Frances Street project for approximately three years, from the latter part of 1989 to the latter part of 1992. Later in her testimony, she responded affirmatively when plaintiffs' counsel asked whether it was correct that the whole reason she was working on the project was because the groundwater contamination at the site had spread to other property. According to plaintiffs, Wright-Shacklett's answers would have allowed the jury to infer that the Water Board knew of the contamination's spread in the latter part of 1989, more than 72 hours before it gave its first Proposition 65 notice on January 4, 1990. (See Health & Saf. Code, § 25249.5 et seq.)

[31] We express no opinion as to whether the Everett and Wright-Shacklett testimonies were sufficient to create a triable issue of material fact.

Cal.App.3d 959, 966 [123 Cal.Rptr. 309]; *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28–29 [21 Cal.Rptr.2d 104].)

Based on the evidence before it, the trial court properly granted summary judgment to the State.[32,33]

E. *Fee Award Based on Section 1038*

After granting the State's summary judgment motion, the trial court awarded the State $672,501.25 in attorney fees and $439,535.31 in expert witness fees under section 1038.[34]

■ Plaintiffs first contend that the present action was not brought under the California Tort Claims Act, but under Proposition 65. This contention is without merit. The Tort Claims Act governs all liability against public entities in California. (See *County of Los Angeles v. Superior Court* (2005) 127 Cal.App.4th 1263, 1267 [26 Cal.Rptr.3d 445].) Plaintiffs' theory of liability against the State was based solely on the State's asserted vicarious liability for the alleged omissions of designated Water Board employees. The doctrine of vicarious liability based on respondeat superior is made applicable to public employers by Government Code section 815.2. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 209–210 [285 Cal.Rptr. 99, 814 P.2d 1341].) In fact, plaintiffs expressly rely on Government Code sections 815.2, subdivision (a) and 820 in making their vicarious liability argument. They are thus in no position to argue that section 1038 is inapplicable to their claims against the State.

The applicable standard of review under section 1038 was set forth in *Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 [6 Cal.Rptr.2d 874]

---

[32] To the extent that plaintiffs argue in passing that they should have been permitted to conduct further discovery in connection with the State's motion, they waived such argument by failing to request a continuance to conduct discovery in the trial court. (*Lewinter v. Genmar Industries, Inc.* (1994) 26 Cal.App.4th 1214, 1224 [32 Cal.Rptr.2d 305].)

[33] We do not reach the additional grounds proposed by the State for upholding the trial court's decision.

[34] Section 1038 provides in relevant part: "(a) In any civil proceeding under the California Tort Claims Act . . . , the court, upon motion of the defendant . . . , shall, at the time of the granting of any summary judgment, . . . or at a later time . . . , determine whether or not the plaintiff . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justifiable controversy under the facts and law which warranted the filing of the complaint . . . . If the court should determine that the proceeding was not brought in good faith and with reasonable cause . . . the court shall render judgment in favor of that party in the amount of all reasonable and necessary defense costs . . . . [¶] (b) 'Defense costs,' as used in this section, shall include reasonable attorneys' fees, expert witness fees, the expense of services of experts, advisers, and consultants in defense of the proceeding . . . ."

(*Knight*): "*Good faith,* or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations] . . . . A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence. Because the good faith issue is factual, the question on appeal will be whether the evidence of record was sufficient to sustain the trial court's finding. [¶] *Reasonable cause* is to be determined objectively, as a matter of law, on the basis of the facts known to the plaintiff when he or she filed or maintained the action. Once what the plaintiff (or his or her attorney) knew has been determined, or found to be undisputed, it is for the court to decide ' "whether any reasonable attorney would have thought the claim tenable . . . ." ' [Citations.] Because the opinion of the hypothetical reasonable attorney is to be determined as a matter of law, reasonable cause is subject to de novo review on appeal."

Other than the asserted groundlessness of plaintiffs' claims against it, the State offered no factual basis or argument in the trial court for an inference that plaintiffs lacked a "good faith belief that there was a justifiable controversy under the facts and law." The trial court for its part made no factual findings in support of its order under section 1038. Accordingly, the section 1038 fee award must stand or fall in this case on whether, under de novo review, plaintiffs had "reasonable cause" to bring or maintain the proceedings against the State. (See *Knight, supra,* 4 Cal.App.4th at p. 931 [§ 1038 applies not only to commencement of action but also to maintaining it without reasonable cause after it has been filed]; *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 863–864 [80 Cal.Rptr.2d 803, 968 P.2d 514] (*Kobzoff*) [a defendant may recover defense costs if trial court finds the plaintiff lacked *either* reasonable cause *or* a good faith belief the case was justified].)

 Section 1038 provides a way for public entities, who are barred from bringing malicious prosecution suits, to recover the cost of defending frivolous suits. (*Kobzoff, supra,* 19 Cal.4th at p. 857; *Knight, supra,* 4 Cal.App.4th at p. 931 [§ 1038 provides "a judicially approved alternative to a constitutionally proscribed action for malicious prosecution"].) The case law on the tort of malicious prosecution provides analogous, instructive, and persuasive authority in construing the concept of "reasonable cause" under section 1038. (*Carroll v. State of California* (1990) 217 Cal.App.3d 134, 141–142 [265 Cal.Rptr. 753].) In particular, the term "reasonable cause" in section 1038, and as defined in *Knight,* is synonymous with the term "probable cause" in malicious prosecution law. (*Knight,* at p. 932; see *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 886 [254 Cal.Rptr. 336, 765 P.2d 498].)

In *Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375 [90 Cal.Rptr.2d 408] (*Roberts*), the Court of Appeal held that "[i]n an action

alleging malicious prosecution of an earlier suit, evidence that the trial court in the earlier suit denied a defense summary judgment motion establishes that there was probable cause to bring the earlier suit." (*Id.* at p. 378.) The *Roberts* court reasoned as follows: "California courts have held that victory at trial, though reversed on appeal, conclusively establishes probable cause. [Citations.] The rationale is that approval by the trier of fact, after a full adversary hearing, sufficiently demonstrates that an action was legally tenable. [Citation.] . . . [S]uccess at trial shows that the suit was not among the least meritorious of meritless suits, those which are totally meritless and thus lack probable cause. [¶] Denial of a defendant's summary judgment motion provides similarly persuasive evidence that a suit does not totally lack merit. A federal judge denies summary judgment if there are 'genuine issues of material fact' for trial, and the moving party is not 'entitled to judgment as a matter of law.' [Citation.] A California judge must reach similar conclusions to deny summary judgment. [Citation.] These conclusions necessarily imply that the judge finds at least some merit in the claim. The claimant may win, if certain material facts are decided favorably. This finding (unless disregarded) compels conclusion that there is probable cause, because probable cause is lacking only in the total absence of merit." (*Id.* at p. 383, italics omitted.)

The same principle was recognized by our Supreme Court in *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*): "[O]ur decision in [*Sheldon Appel Co. v. Albert & Oliker*] clarified that probable cause to bring an action does not depend upon it being meritorious, as such, but upon it being arguably tenable, i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable. [Citation.] Denial of a defense summary judgment motion on grounds that a triable issue exists, or of a nonsuit, while falling short of a determination of the merits, establishes that the plaintiff has substantiated, or can substantiate, the elements of his or her cause of action with evidence that, if believed, would justify a favorable verdict . . . . [A] claimant or attorney who is in possession of such evidence has the right to bring the claim, even where it is very doubtful the claim will ultimately prevail. [Citation.]" (*Id.* at p. 824, italics omitted.)

In this case, the court denied the State's original summary judgment motion and, with a different judge presiding, denied a substantially similar motion for judgment on the pleadings. Plaintiffs were allowed to try their case to a jury although not to a verdict. It is true that the court ultimately reversed the earlier summary judgment ruling but, as stated in *Wilson*: "It would be a ' "hard law," ' indeed, that ' "would render a plaintiff liable in

damages for instituting an action . . . in the event that, notwithstanding a judge of the superior court was satisfied that upon those facts the plaintiff had a meritorious case, a ruling to that effect should afterwards be set aside." ' " (*Wilson, supra,* 28 Cal.4th at p. 822, quoting *Cowles v. Carter* (1981) 115 Cal.App.3d 350, 357 [171 Cal.Rptr. 269].)

In our view, based on the principles applied in *Roberts* and *Wilson,* the trial court's award to the State under section 1038 must be reversed. Although we have found that the State was ultimately entitled to summary judgment, we cannot say that no reasonable attorney would have thought plaintiffs' claim against the State tenable.

### F. *Section 998 Award to the State*

In May 2005, the State made a settlement offer to plaintiffs under section 998, which plaintiffs declined to accept.[35] The offer was to pay each plaintiff $1,000. After granting the State's summary judgment motion, the court awarded the State $439,535.31 in expert witness fees based on section 998. On appeal, plaintiffs contend the award must fail because (1) the State's offer was not made in good faith, and (2) the court failed to consider the financial impact of its award on plaintiffs.

A section 998 offer must be made in good faith to be valid. (*Wear v. Calderon* (1981) 121 Cal.App.3d 818, 821 [175 Cal.Rptr. 566].) Good faith requires that the offer of settlement be " 'realistically reasonable under the circumstances of the particular case . . . .' [Citation.]" (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262 [74 Cal.Rptr.2d 607].) A token or nominal offer made with no reasonable prospect of acceptance will not pass the good faith test. (*Ibid.*)

"Whether a section 998 offer was reasonable and made in good faith is left to the sound discretion of the trial court." (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134 [84 Cal.Rptr.2d 753].) "In reviewing an award of costs and fees under Code of Civil Procedure section 998, the appellate court will examine the circumstances of the case to determine if the trial court abused its discretion in evaluating the reasonableness of the offer or its refusal." (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 152 [118 Cal.Rptr.2d 569].) " ' ["]The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless

---

[35] Section 998, subdivision (c)(1) states in relevant part: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment . . . . the court . . . , in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in . . . preparation for trial . . . or during trial . . . of the case by the defendant."

there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." [Citations.]' " (*Nelson v. Anderson*, at p. 136.)

Plaintiffs failed to satisfy their burden of demonstrating a clear abuse of discretion in this case. To prevail against the State at trial, plaintiffs had the burden of proving that a designated State employee had violated Proposition 65. Despite time to investigate the facts before filing, and four years after filing suit in which to depose Water Board employees and review all of the Water Board's files on this subject, the plaintiffs' opposition to the State's 2004 summary judgment motion showed that plaintiffs had little more to support their Proposition 65 claim than a shaky circumstantial argument based on the text of the 1988 cleanup and abatement order. From the State's viewpoint, given the weakness of the plaintiffs' case, the fact that the State's summary judgment motion had been denied did not mean that plaintiffs were likely to prevail at trial. This was particularly the case since the trial court had decided the motion without considering the principal declaration the State had offered in support of it.

Plaintiffs also maintain that before setting the amount of the award under section 998, the trial court should have first considered the award's severe financial impact on them. (See *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1561–1562 [47 Cal.Rptr.3d 206] [when opposing parties possess vastly disparate economic resources, court may be required to " 'scale' " the award to their respective resources to avoid placing undue pressure on the less affluent party to accept unreasonable § 998 offers].) Plaintiffs did not raise this issue in the trial court nor have they created a factual record sufficient to resolve it in their favor. For example, there is no evidence in the record regarding the assets owned by plaintiffs, including the disposition of the settlement proceeds obtained in this lawsuit. Although we nonetheless have discretion to consider the issue, we decline to do so because no important question of public policy is involved. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [13 Cal.Rptr.3d 786, 90 P.3d 746].) In any event, we find no indication that the Legislature intended to require courts to conduct a means test as part of determining the amounts to award under section 998. Such a rule, which would alter the settlement incentives provided by section 998 in a wide range of cases, should not be mandated by placing a judicial gloss on the statute's text.

We find no abuse of discretion in the fact or amount of the trial court's section 998 award to the State.

## III. DISPOSITION

The orders awarding sanctions pursuant to In Limine Order No. 1, and sections 128.7 and 1038, are reversed as is the judgment dismissing plaintiffs' claims against OCLI. The summary judgment and order awarding expert witness fees under section 998 in favor of the State are affirmed. The matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Each side shall bear its own costs on appeal.

Stein, Acting P. J., and Swager, J., concurred.

A petition for a rehearing was denied August 13, 2008, and the petition of respondent Union Pacific Railroad Company for review by the Supreme Court was denied October 28, 2008, S166442. George, C. J., did not participate therein.