[Nos. A122783, A124451. First Dist., Div. Five. June 30, 2010.]

CHRISTINE HOLMAN, Plaintiff and Appellant, v.
ALTANA PHARMA US, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A. and II.B.

COUNSEL

Law Offices of Lawrence A. Organ, Lawrence A. Organ, Meghan A. Corman, Lilly E. Shilton, William Fernholz; Nancy Balles, Nancy J. Balles and Marjorie A. Wallace for Plaintiff and Appellant.

Seyfarth Shaw, Patricia H. Cullison and Cassandra H. Carroll for Defendant and Respondent.

OPINION

**BRUINIERS, J.**—Christine Holman (Holman) sued her former employer, Altana Pharma US, Inc. (Altana), under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.).[1] She alleged causes of action for wrongful suspension in violation of public policy, age and sex

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

discrimination, hostile work environment harassment, failure to take reasonable steps to prevent discrimination and harassment, and retaliation. Altana was granted summary adjudication of Holman's claim for hostile work environment harassment. At trial Holman voluntarily dismissed her claims for wrongful suspension in violation of public policy, age and sex discrimination, and failure to take reasonable steps to prevent discrimination and harassment. At the close of evidence, the trial court granted Altana's motion for nonsuit, pursuant to Code of Civil Procedure section 581c, with respect to her remaining retaliation claim, including her claim for punitive damages. Holman contends that the trial court abused its discretion in excluding certain evidence and erred in granting nonsuit. Holman also appeals from the postjudgment order awarding expert witness fees to Altana as costs. We remand for reconsideration of the amount of the award of expert witness fees, but affirm in all other respects.

## I. Factual and Procedural Background

Viewing the record in the light most favorable to Holman, as we must, the evidence Holman presented at trial reveals the chronology of events detailed here.[2] In July 1999, Holman was hired by the Savage Laboratory division of Altana, Inc. Holman first worked as a sales trainee and then as a professional sales representative. During this time, Holman was responsible for promoting prenatal vitamins and other pharmaceuticals to physicians. Between September 2000 and September 2002, Holman was supervised by Wanda Roland (Roland).

In September 2002, the Savage Laboratory division was closed. An interim performance appraisal was used to assess which employees would be moved to Altana. Roland gave Holman a "Meets Expectations" rating on this appraisal. Accordingly, Holman was moved to a sales representative position at Altana, along with other employees who were meeting performance expectations.

Altana contracted with Pharmacia (later acquired by Pfizer) to market the product Detrol LA, which is prescribed to treat overactive bladder. The goal was to develop Altana's infrastructure, name recognition, and sales force so

---

[2] For purposes of reviewing the trial court's ruling on the nonsuit motion, we have disregarded the testimony of defense witnesses and any unfavorable testimony received from adverse witnesses Holman called under Evidence Code section 776. (See *Ashcraft v. King* (1991) 228 Cal.App.3d 604, 611 [278 Cal.Rptr. 900] [in determining motion for nonsuit, testimony favorable to plaintiff adduced from an adverse witness under Evid. Code, § 776 must be taken as true and unfavorable portions disregarded]; cf. *Miller v. Dussault* (1972) 26 Cal.App.3d 311, 316–317 [103 Cal.Rptr. 147] [same rule applied to motion for judgment under Code Civ. Proc., § 631.8].)

that Altana would later have the capability to promote its own product, which was in development. Holman was assigned to market Detrol LA within the "Fremont territory." Alexea Berchem (Berchem), Altana's district manager for the San Francisco Bay Region, became Holman's supervisor. Berchem reported to Lynne Hamilton Lang (Lang), Altana's regional sales director for the western region.

Pfizer paid Altana based on the number of calls Altana's sales force made to physicians. Thus, Altana's sales representatives were evaluated, in part, on their call numbers. Altana's sales representatives were given a call goal of nine calls per day. Nonetheless, market share was also used in evaluating Altana's sales representatives, as Altana was "trying to prepare [its] sales force for the new products" and Pfizer insisted on it. Accordingly, both district managers and sales representatives were paid bonuses based on their call numbers and share of market statistics.[3]

Altana's sales representatives were paid a base salary and were eligible for bonus compensation, which was paid on a trimester basis (every four months). Bonus compensation could constitute between 20 and 30 percent of a sales representative's annual compensation. To qualify for a bonus, a sales representative was required to (1) be an Altana employee on the first day of the third month of the trimester and at the time of bonus payout; (2) average at least 121 calls on "Target Prescribers" during each month of the bonus period; and (3) be "in good standing with regards to performance standards." Once eligible, the amount of the bonus payment was determined by ranking the territory's "share of market" and "share of market change" numbers as compared to other territories within the region.

Altana's district managers prepared field contact reports (FCR's) approximately once a month, after going on a ride-along in the field with a sales representative. After an October 28, 2002 ride-along, Holman received her first FCR from Berchem. The October 28 FCR showed that her average daily calls were above the goal of nine calls per day. The FCR gave Holman a rating of "Needs Improvement" in three areas: "Approach," "Pre-call plan/Post-call analysis," and "Product/Competitive knowledge." She received "Meets Expectations" ratings in 18 other areas and "Exceeds Expectations" ratings in three areas.

---

[3] "Share of market" represented the percentage of prescriptions in a given territory that were written for Detrol LA, as compared to prescriptions written for competing products. "Share of market change" measures how a territory's share of market changed as compared to a previous time period. "Share of market" statistics represented the team's efforts in a given territory, rather than just one single person's efforts. Altana did not have access to "share of market" numbers for each individual sales representative.

In late November 2002, Berchem reported to human resources that Holman's "Meets Expectations" rating from the September interim review was still appropriate. On December 10, 2002, Berchem conducted another ride-along with Holman. The FCR that Holman received after the ride-along showed that her average daily calls were above the goal of nine calls per day. The FCR gave Holman a rating of "Needs Improvement" in three areas: "Approach," "Pre-call plan/Post-call analysis," and "Product/Competitive knowledge." She received "Meets Expectations" ratings in 12 other areas and "Exceeds Expectations" ratings in nine areas. The FCR also provided: "You obviously have strong relationships with your accounts and they like you. Be sure to capitalize on those relationships and present the product information with a belief in why you are there. Stand strong and show them you are passionate about the product."

In January 2003,[4] Holman received a raise, along with the rest of the Altana sales force. After a February 3 ride-along, Holman received an FCR from Berchem that observed: "Significant improvement in presentation style with more passion and relaxed demeanor and body language, and utilizing sales strategies! Great effort, [Holman]!" The February 3 FCR showed that her average daily calls were above the goal of nine calls per day. The FCR gave Holman a rating of "Needs Improvement" in two areas: "Approach" and "Interview." She received "Meets Expectations" ratings in 10 other areas and "Exceeds Expectations" ratings in 12 areas. Berchem wrote: "your accounts really like you and you have no problems with access . . . ."

Berchem acknowledged that, in March and April, Holman was making progress and showing improvement. After a March 12 ride-along, Holman received an FCR from Berchem that observed: "You are getting better in keeping your body language open and making your point. [¶] Continue to work on your strategy from last week until you are more confident in your delivery. Work on sales strategy and sticking to one key point to get the buy-in and have a strong opening ready. Great effort!" The March 12 FCR showed that her average daily calls were above the goal of nine calls per day. The FCR gave Holman a rating of "Needs Improvement" in two areas: "Approach" and "Pre-call plan/Post-call analysis." She received "Meets Expectations" ratings in 10 other areas and "Exceeds Expectations" ratings in 11 areas. Berchem wrote: "As usual, your relationships are strong with practitioners and office staff. Just stay focused on getting the point across sooner rather than later."

After an April 8 ride-along, Holman received an FCR from Berchem that observed: "This field contact you had much more specific goals set up and it worked beautifully. Continue to refine your strategies until you know exactly

---

[4] Unless otherwise specified, all subsequent dates referenced occurred in the year 2003.

your approach with which tools; own, grow and convert." The April 8 FCR showed that her average daily calls were above the goal of nine calls per day. The FCR gave Holman a rating of "Needs Improvement" in two areas: "Approach" and "Pre-call plan/Post-call analysis." She received "Meets Expectations" ratings in 11 other areas and "Exceeds Expectations" ratings in 11 areas. Berchem wrote: "I am very proud of your progress!" Later in April, Berchem awarded Holman a $50 gift certificate for her work on a flashcard for the Detrol LA product.

On June 5, Berchem did a ride-along with Holman in the field. At lunch, Berchem and Holman discussed a recent corporate policy presentation regarding accountability. Berchem asked if there was anything Holman wanted to discuss. Holman testified: "I told her that I had noticed some things over the previous period and since she had become my manager, and that I had initially thought maybe I was the only one observing these things, but at the Dallas meeting that there were several other reps who came up to me and made comments to me about certain men on the team getting opportunities that either they weren't made aware of or that they thought that Lisa or I should have been doing." Holman testified that she identified the male representatives to Berchem as Greg Casey (Casey) and Matt Verga (Verga). Both Casey and Verga were under 40 years of age. Holman further testified: "I told [Berchem] there was a perception that I had observed myself and that others had confirmed that she was preferring these younger men for opportunities, and that there had been opportunities that I would have been interested in if I had known they were available." Holman testified that she had previously made Berchem aware that she was interested in developmental opportunities.

Holman testified that "after lunch, [Berchem] kind of became a little more critical. She started nitpicking on things that she had never brought up before. She started questioning some of [the] things I was doing in offices that were protocol to that office that I had told her about and had never been an issue before . . . ." Later that day, Berchem left Holman a voicemail saying "she had been thinking about what I had said at lunch, and she could see how it may appear to be favoritism, but that . . . these people had specifically asked for these specific assignments, and that's just kind of the way it was."

Holman testified that when she complained of favoritism on June 5 she believed that she was being discriminated against based on her age, "[b]ecause the majority of developmental opportunities were given to the younger men . . . ." Holman also testified: "[Berchem] asked me multiple times directly how old I was in, I felt, a rather condescending tone. She would point out other reps in the field, younger women, and point out what they were wearing, and, you know, maybe I should dress something like that or get my

hair styled like that. She made comments about getting my hair cut, about exercise. . . . [A]nd she made a comment at one point about—that I should own a house by my age."

Berchem testified that she did not inform human resources about the June 5 conversation because she "did not see it as a complaint, just a discussion."[5] After the June 5 ride-along, Holman received an FCR from Berchem that observed: "Last FCR we worked on focusing your call objective on one solid sales message and then utilizing the tools we have available to make the sale. Working on more of a conversational sale. [¶] This FCR we continued to work on the same objectives. Your best call was the last with Dr. Citron where you got to the point right away and stayed with it. Congratulations!" The June 5 FCR provides that Holman's "share of market" rank was 190 out of 284 territories. It also provides that her "share of market change" rank was 17 out of 284 territories. The June 5 FCR showed that her average daily calls were above the goal of nine calls per day. However, the June 5 FCR gave Holman a rating of "Needs Improvement" in five areas, including "Opening," "Probing," "Delivery of Core Sales Message," "Pre-call planning," and "Post-call analysis." The June 5 FCR also counseled Holman to "capitalize" on her relationships and to work on "impactful openings."

On a Sunday after the June 5 conversation, Berchem called Holman and asked her if she wanted to do a presentation on personality quadrants for the next district meeting that coming Tuesday. Berchem told Holman that she knew it was very short notice and that Holman could say "no." Holman agreed to do it. Berchem testified that Holman "did a good job" with the presentation.

On June 26, Holman arrived late for a ride-along with Berchem. When Holman arrived, Berchem "appeared very angry." Holman explained that a personal situation had arisen. Berchem told Holman: "you need to separate yourself or distance yourself from your friends. Stop interfering. They're getting in the way of your job. . . . If they call, you need to just tell them you have a job to do." Holman testified that, later that day, Berchem "would get right in my face, and she was getting very loud before an office call. And after she was smacking her hand, her right hand into her left hand in front of my face and asking me, you know, 'What are you going to say? What are you going to say?' " Holman responded: "I really think that you need to take a step back and lower your voice." Berchem then became livid. Holman testified: "I thought actually that she was going [to] hit me, she looked that angry."

---

[5] Under Altana policy, if a supervisor received a complaint of discrimination about themselves, "they should go to their manager who should notify someone in human resources."

Holman testified that, during lunch on June 26, Berchem "went into a whole lot of things about . . . 'You don't have enough confidence. You need to show confidence.' . . . I'm not stepping up to the plate. I'm not taking risks. I was being below the line. I wasn't taking her coaching, that I was being resistant to her. It was just . . . a harangue . . . of verbal negative comments." Holman testified that she felt Berchem's behavior "was directly retaliatory because I had told her . . . that I thought she had been favoring people on June 5th."

After the June 26 ride-along, Holman received an FCR from Berchem that gave her territory's "share of market change" rank as 22 out of 284. The FCR observed: "you need to work on building your confidence more in order to convince the offices that you are excited about your product and want to talk to them about why LA is important in their practice. We have now worked on these same goals for the last four months and I am not observing any apparent progress." Berchem also wrote: "sales is more than building relationships. It's asserting yourself to sell and convince someone to buy your product, and that needs to be done with confidence in yourself first, and then in the product. Your numbers are good now, but when we get into selling our own products when there is a lot of competition and you need to sell and not just build relationships, I am concerned about your ability to do this with confidence. Your overall attitude and demeanor makes a difference! Detrol LA is more of a relationship sell than the products we will have in the future. [¶] Bottom line is that you are good at administrative skills and relationship building, but when you get into a selling situation where you need to utilize your selling skills you appear nervous, and I have observed you physically shake during sales presentations on multiple field contacts." The June 26 FCR gave Holman a rating of "Needs Improvement" in eight areas, including "Opening," "Probing," "Delivery of Core Sales Message," "Handling Objections," "Pre-call planning," "Post-call analysis," "Use of visuals/support materials," and "Product/Competitive knowledge." However, the June 26 FCR showed that her average daily calls were above the goal of nine calls per day.

On July 8, Berchem did another ride-along with Holman. Holman testified that, as soon as Berchem arrived at the meeting point, "she came running over from her car and ran up to me and just . . . asked me very angrily, 'Why are you waiting to respond to the FCR? Why are you doing this?'" Holman further testified that, in the courtyard outside of the first doctor's office, "[Berchem] was in my face and smacking her hand and, you know, 'What are you going to say? You need to be succinct? What are you going to say? You have to know what you're going to say.' And I was trying to say what I was going to say, and she would interrupt me . . . ." Holman testified that, after the first doctor visit, "[Berchem] started questioning me on why I hadn't asked Dr. Fong this, and why I hadn't asked Dr. Fong that and was just again

very intense. . . . [S]he brought up the FCR again and wanted to know why I was waiting, what was wrong with it, you know, what problem did I have."

Holman testified that, at lunch on July 8, "[Berchem] immediately pulled out . . . a laminated sheet that was the above-the-line, below-the-line piece that we had gotten from [a May sales] meeting and started to tell me how I was being below the line, and I was making excuses, and I wasn't taking her coaching, just, you know, really kind of smacking the thing and saying, you know, 'You're blaming me for your shaking[6] . . . .' "

After the July 8 ride-along, Holman received an FCR from Berchem. The Fremont territory's "share of market change" rank was 22 out of 284. Berchem observed: "I did not see a significant improvement in today's observations . . . . The areas that we focused on were the same as last time; selling the product with one key objective planned, and selling with enthusiasm and confidence in order to get into in-depth discussions with your accounts." The July 8 FCR gave Holman a rating of "Needs Improvement" in nine areas, including "Opening," "Probing," "Delivery of Core Sales Message," "Handling Objections," "Converting Features to Benefits," "Pre-call planning," "Post-call analysis," "Use of visuals/support materials," and "Product/Competitive knowledge." The July 8 FCR showed that her average daily calls were above the goal of nine calls per day. The FCR closed by stating: "you have been working as a Sales Representative for Altana for four years now. We have discussed and reviewed your performance on a regular basis on our field contacts, and I have observed that you are not meeting expectations in the area of your selling skills, enthusiasm and confidence levels. It is imperative that in the next 60 days, by September 8th, that your performance in these areas meets expectations or I will need to consider further corrective actions . . . including placing you on a Letter of Warning."

On July 21, Holman submitted a written response to the June 26 and July 8 FCR's to both Berchem and Lang. Holman wrote: "Since the . . . ride-along on 6-5-03 there has been a very obvious downgrading on my evaluations through 7-08-03. Your demeanor during ride-alongs appeared to change on 6-5-03 when I conveyed to you some of the issues and concerns that were expressed within the team during the Dallas meeting. . . . However in retrospect from that time on you began to find increasing fault in small issues and began to downgrade items within my FCRs, without giving explanation or indication of change of expectations . . . ." Holman also wrote: "Yes, I cried on the 8th, the personal situation is stressful and tragic and you were compounding it by forcing a discussion concerning my disagreement with your last FCR that I was not ready to have. I didn't want to discuss it then

---

[6] Holman told Berchem on one of their first ride-alongs that she has a hereditary condition that causes uncontrollable shaking.

and told you so at least three times. When I informed you of the affect [*sic*] of your actions you accused me of going 'below the line' when I was just taking Altana up on it's [*sic*] promise to hold those above me accountable. I challenged you to see your place in things and you retaliated."

On July 21, Holman also sent a separate letter to Lang alone. Holman wrote: "I would like to believe that [Berchem] is not purposely being retaliatory or spiteful, but that she firmly sees herself in the right, which makes it all the more important to have my views on record. . . . [¶] . . . She says she only wants me 'to take [her] coaching', but her 'coaching' style often comes across as confrontational and demeaning: saying the same thing over again, only louder and with more force, does nothing to facilitate understanding. . . . [¶] . . . Brow beating me into tears by telling me how lacking I am, that I 'take things too personally', am 'too sensitive', have a 'very fragile ego', have 'too much drama' around me, and 'should get therapy' are not conducive to making anyone feel valued or accepted, on the contrary. Commentary about her belief that I am 'unhappy in this job' and maybe I'd 'be happier elsewhere', or that I should 'go back to teaching' are inappropriate and condescending. Her increasing innuendo is of a negative opinion as to my suitability to remain at Altana. She has passed personal judgments upon me outside the bounds of her position. She has repeatedly asked my age and becomes visibly irritated by my refusing to respond to questions that are clearly inappropriate. Recommendations that I 'get exercise', change my hairstyle, or 'distance' myself from my friends because they are 'interfering with the job' are also completely out of line. . . . The inappropriateness of these repetitive comments, and frequency of them, feels like harassment." Holman also wrote: "She's often contradictory, non-directional and confusing in her instructions. She seems to want what she wants when she wants it, but she is often unable to effectively communicate what that is until she doesn't get it. . . . I currently consider this to be an increasingly hostile environment."

After receiving the letter, Lang sent it to Veda Pennington (Pennington), Altana's human resources manager, "[b]ecause there were some things that [Holman] said about her boss that concerned me, and I wanted some counsel from human resources as to how to respond." Mindy Kirsch (Kirsch), Altana's senior director of human resources, also received a copy of the letter. Pennington and Lang discussed the letter and decided (1) that Lang would do a ride-along with Holman; (2) that employees would be surveyed regarding Altana's cultural values; and (3) that Lang would coach Berchem regarding management style. Because Holman's letter used certain "buzz words," such as "harassment" and "hostile work environment," it was determined "that it was a complaint about hostile work environment and possible harassment" that needed further investigation.

On August 6, Lang joined Holman for a ride-along. Lang testified that the first call of the day went well. However, Lang observed in her written notes that, throughout the morning, Holman "seemed nervous and was shaking. She did not seem at all comfortable with her selling materials as one would think she should after being a sales representative for four years." Over lunch, Lang told Holman that she wanted to talk to her about her complaints about Berchem. Holman told Lang that she felt there was nothing she could do right, even though she was performing at the same level as before. Holman also told Lang about her conversation with Berchem on June 5, in which she had told Berchem "that there was a perception that . . . [Berchem] was giving priority with developmental opportunities to the younger men on the team."

After the ride-along, Lang concluded: "Bottom Line: [Holman] appeared to be an unassertive, frightened person lacking in self-confidence. I really do not think that selling should be the profession that she has selected, and I believe that she is miscast in this position. I am concerned that she is having difficulty doing the basics after being a sales representative for Savage and then [Altana] for four years. . . . [¶] I am also concerned about her ability to master and effectively sell three products beginning September 15, 2003 when we receive Zoloft and Xanax XR in addition to Detrol LA." Berchem and Lang met that same day, after Lang's ride-along. On August 6, Berchem, Lang, and Pennington decided that Holman would be placed on a letter of warning.

The cultural survey, which asked employees general questions relating to Altana's corporate values, was conducted by telephone. An introduction was also read, which pointed out: "information from this conversation is totally confidential. However, I must share with you as an HR professional any allegations of discrimination or harassment will be investigated further." Holman was not asked any questions specific to her complaint as part of the cultural survey. Holman did indicate, in response to the survey, that she felt "rewards are more favoritism not performance" and that she "provided feedback and was retaliated against in a very demeaning & destructive way." After the ride-along and cultural survey were conducted, it was concluded that Holman and Berchem disagreed about management style, that Holman had performance issues, and that no additional action would be taken with respect to Holman's complaint.

In August, the June numbers showed that Holman's territory had the best "share of market change" in the district. For the trimester covering May through August, Holman received a bonus of $3,198. In September, Holman's territory changed from Fremont to Berkeley.

Although the original plan was to give Holman the letter of warning on September 15, Berchem in fact gave Holman the letter of warning on

September 29. In the interim, on September 17, Lang sent Berchem a copy of Holman's July 21 letter that had been sent to Lang alone. Lang wrote: "Let's talk this evening regarding this letter and your day with Lisa. [¶] As a reminder, you do NOT want to indicated [*sic*] to [Holman] that I have shared this letter with you." Lang conceded at trial that the letter, which she understood as a complaint about Berchem, should not have been shared with Berchem.

The letter of warning was drafted by Berchem and Lang, and reviewed by Pennington. It provides: "As you know, we have discussed your performance over the last year since you began reporting to me in September 2002. There are several areas of concern, and I have discussed these issues with you on a number of occasions over the past few months. . . . [¶] As noted in your Field Contact Report, dated July 8, 2003, you were given sixty (60) days to adopt a more positive selling approach and become a more confident Sales Representative. While I understand that people have different personalities, a certain level of positive confidence is necessary to be a successful Sales Representative. Specifically, I asked that you work on your attitude and demeanor to be 'above the line' (taking accountability and not relying on excuses) on a consistent basis, and to become more conversational in your sales calls in order to have more in-depth discussions with the medical professionals that you call on. [¶] . . . [¶] In the majority of field contacts over the past year, you have been encouraged to take more risks to improve your selling skills. Specifically, I have documented your goals, which were designed to work on your presentation skills by presenting your product with assertion and passion, and utilizing specific sales strategies in order to have more in-depth discussions with your accounts. I have not observed progress in these areas over the past twelve (12) months, and in seven (7) field contacts. [¶] . . . As noted in the majority of Field Contact Reports, you have been encouraged to improve your selling skills and become more involved with the ALTANA team as well as with your Pharmacia, and now Pfizer counterparts. Over the past twelve (12) months I have worked with you seven (7) times, and I have not seen any improvement in these areas. . . . [¶] . . . [¶] . . . On numerous occasions during July, August and September, you have directed business voicemail and email communications directly to [Lang], the Regional Sales Director (and my supervisor), without copying me. This is considered inappropriate and does not adhere to the professional chain-of-command protocol."

The letter of warning also provides: "Because I have not observed any progress in these areas, I am placing you on a Letter of Warning effective today, September 29, 2003. By being placed on a Letter of Warning, you are no longer considered in 'Good Standing,' making you ineligible to participate in any Incentive Compensation Programs until performance issues are resolved and you are removed from the Letter of Warning." The letter of

warning identified areas that must be improved and stated that Berchem would evaluate Holman's activities over the next 30 days. The letter of warning closes by stating that "[f]ailure to meet these expectations by the assigned timelines will result in further corrective actions pertaining to your employment, up to and including termination." The next day, Holman called in sick. On October 3, Holman advised Berchem that she was taking a medical leave of absence and never returned to Altana.[7]

On January 19, 2005, Holman filed a complaint in the Contra Costa Superior Court alleging four causes of action: (1) retaliation, in violation of section 12940, subdivision (h); (2) harassment and discrimination on the basis of age and sex, in violation of section 12940, subdivisions (a) and (j); (3) failure to take reasonable steps to prevent discrimination or harassment, in violation of section 12940, subdivision (k); and (4) wrongful suspension in violation of public policy. Holman later filed a first amended complaint, adding Berchem as an individual defendant, and a second amended complaint that alleged the same causes of action.

Altana filed a motion for summary judgment, or alternatively, summary adjudication of claims. Judge Becton Smith denied Altana's motion for summary adjudication with respect to Holman's retaliation claim. In its ruling, the court stated: "The Court finds that [Holman] engaged in 'protected activity' pursuant to Govt. Code § 12940(h) beginning on June 5, 2003. On that date she complained to her supervisor, [Berchem] that it was 'unfair favoritism, that she was providing training/developmental assignments to *younger*, less experienced sales representatives like *Greg Casey and Matt Verga*, but not to [her'] . . . This statement is sufficient to convey the complaint of discrimination based upon both age and gender. . . . [¶] . . . [¶] Here, the 9/29/03 Warning Letter from Altana to [Holman] constitutes an adverse employment action. There are also numerous disputed issues of fact as to whether Field Contact Reports (FCR) prepared after the June 5, 2003 complaint constitute adverse employment actions. . . . [¶] The temporal proximity between [Holman's] complaint(s) and the adverse employment actions is sufficient to constitute an issue of fact as to causation. . . ." However, Judge Becton Smith granted Altana's motion for summary adjudication with respect to Holman's harassment cause of action. In granting summary adjudication, the court specifically stated: "The work environment alleged by [Holman] is not sufficiently severe or pervasive as to create an abusive working environment."

---

[7] The only testimony on this issue was from Berchem. Holman asserts in her brief, without citation to the record, that she "took a medical leave of absence on September 29, 2003. She did not return to Altana Pharma, and her employment officially ended on January 28, 2005."

The case proceeded to jury trial before Judge Judith Craddick.[8] After the close of Holman's case in chief, the court granted Altana's motion for nonsuit with respect to punitive damages and liability for retaliation. With respect to punitive damages, the trial court stated: "I feel that what you have brought out are arguments, and the evidence that you have argued does not arise to the level of malice or conscious disregard, so I am going to grant a nonsuit on the punitive damages issue." With respect to Holman's retaliation cause of action, the trial court observed: "I believe that the evidence is insufficient without engaging in conjecture and something that's highly improbable to state that she probably would have—that she presented evidence that she probably would have received a bonus during those 60 days. She was, after all transferred from Fremont. She stopped working after the letter of—of warning. . . . She was basically given 30 days to improve, and we don't know whether she would have improved or not because she stopped working after that. And we don't know whether she would have received any bonus or how much it would have been." The court also stated: "you failed to present sufficient evidence to make the causal connection between the two remaining prongs, and the important part of my decision on adverse employment action is that it is speculation and conjecture." Accordingly, the court entered judgment in favor of Altana and against Holman. The judgment awarded costs to Altana, in an amount to be determined. Holman filed a timely notice of appeal from the judgment.

Altana filed a memorandum of costs in the amount of $212,026.65 that included a claim for $128,925.12 in expert witness fees pursuant to Code of Civil Procedure section 998.[9] Holman responded with a motion to tax costs, including the claim for expert witness fees. The trial court denied Holman's motion and awarded Altana costs in a total amount of $190,963.11, including the expert witness fees. Holman filed a timely notice of appeal from the orders denying her motion to tax costs. Holman's two appeals were consolidated.

## II. Discussion

Holman challenges the trial court's determination that she failed to present substantial evidence in support of her retaliation and punitive damages claims. In addition, Holman attacks the trial court's exclusion of certain evidence that, according to her, showed Altana's solicitation of negative

---

[8] Holman dismissed her causes of action for discrimination, failure to prevent harassment and discrimination, and wrongful suspension in violation of public policy. Holman also dismissed her claims against Berchem.

[9] It is undisputed that, in February 2006, Holman refused Altana's Code of Civil Procedure section 998 offer in the amount of $20,001.

feedback. Finally, Holman argues that the trial court erred by awarding Altana its expert witness fees. We separately address each of Holman's arguments below.

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Expert Witness Fees*

Holman also appeals from the trial court's award of $128,925.12 in expert witness fees to Altana.[25] Holman argues that a defendant prevailing on a FEHA claim may recover expert witness fees only when the plaintiff's case has been found to be frivolous or without merit. Because there has been no such finding, Holman suggests that Altana may recover only its routine litigation costs, but not its expert witness fees.[26]

Holman does not argue here that the expert witness fees were unreasonable in amount, or deny that the award of such fees is normally a matter of trial court discretion. Rather, the threshold question we must address is whether a prevailing employer in a FEHA case must show that the plaintiff's case was frivolous before it may recover expert witness fees under Code of Civil Procedure section 998.

We review the trial court's resolution of this issue de novo. (*Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1374 [29 Cal.Rptr.3d 306] [de novo review of trial court order " ' "warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law" ' "]; accord, *Baker-Hoey v. Lockheed Martin Corp.* (2003) 111 Cal.App.4th 592, 596–597 [3 Cal.Rptr.3d 593].)

▪ " 'The right to recover any . . . costs [of a civil action] is determined entirely by statute.' " (*Baker-Hoey v. Lockheed Martin Corp., supra,* 111 Cal.App.4th at p. 597.) This case requires us to determine the appropriate

---

*See footnote, *ante,* page 262.

[25] Holman does not challenge the balance of the cost award.

[26] Altana argues in passing that Holman forfeited this argument when she failed to present it to the trial court before filing her reply brief on the motion to tax costs. We note that Altana addressed the merits of this argument at the hearing on Holman's motion to tax costs. And even if Holman did not properly raise her argument before the trial court, we have discretion to consider this question of law on appeal. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].) We exercise our discretion to review Holman's argument on the merits.

interplay of four statutory provisions: Government Code section 12965 and Code of Civil Procedure sections 998, 1032, and 1033.5. "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Fees of experts not ordered by the court are not ordinarily recoverable as costs to a prevailing party, unless expressly authorized by law. (Code Civ. Proc., § 1033.5, subd. (b).) However, section 12965, subdivision (b), provides in relevant part: "In actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs, *including expert witness fees*, except where the action is filed by a public agency or a public official, acting in an official capacity." (Italics added.)

Code of Civil Procedure section 998 also applies in cases, such as this, in which a prior settlement offer has been rejected. The statute provides, in relevant part: "(a) The costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section. [¶] . . . [¶] (c) (1) If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, . . . *the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses*, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (Code Civ. Proc., § 998, subds. (a), (c)(1), italics added.)

### 1. *The* Christiansburg *Standard*

■ Holman relies on *Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412 [54 L.Ed.2d 648, 98 S.Ct. 694] (*Christiansburg*) to support her argument that Altana is not entitled to expert witness fees unless Holman's action is determined to be frivolous. In *Christiansburg*, the United States Supreme Court held that "a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." (*Id.* at p. 421.) In reaching this conclusion, the court relied on the legislative history of section 706(k) of title VII of the Civil Rights Act of 1964 (Title VII),[27] which made clear that "while Congress wanted to clear the way for suits to be brought under the

---

[27] The statute, in its current form, provides: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person." (42 U.S.C. § 2000e-5(k).)

Act, it also wanted to protect defendants from burdensome litigation having no legal or factual basis." (*Christiansburg, supra,* 434 U.S. at p. 420.) The court reasoned: "That [section] 706(k) [of Title VII] allows fee awards only to prevailing private plaintiffs should assure that this statutory provision will not in itself operate as an incentive to the bringing of claims that have little chance of success. To take the further step of assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." (*Id.* at p. 422, italics & fn. omitted.)

It is now settled that the *Christiansburg* standard must be satisfied before a defendant prevailing in a FEHA action may recover attorney fees. (See, e.g., *Mangano v. Verity, Inc.* (2008) 167 Cal.App.4th 944, 948–949 & fn. 7 [84 Cal.Rptr.3d 526] (*Mangano*); *Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387 [15 Cal.Rptr.2d 53] (*Cummings*).) However, there is a split of authority about whether the *Christiansburg* standard applies to "costs." (Compare *Perez v. County of Santa Clara* (2003) 111 Cal.App.4th 671, 681 [3 Cal.Rptr.3d 867] (*Perez*) ["ordinary litigation costs are recoverable by a prevailing FEHA defendant even if the lawsuit was not frivolous, groundless, or unreasonable"] and *Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 134–135 [33 Cal.Rptr.3d 287] (*Knight*) [same] with *Cummings, supra,* 11 Cal.App.4th at p. 1387 [*Christiansburg* standard applicable when determining whether to award fees and costs to a prevailing FEHA defendant].) Neither *Knight, Perez,* or *Cummings* answers the specific question presented here because they did not deal explicitly with expert witness fees, but only "ordinary litigation costs." (*Knight, supra,* 132 Cal.App.4th 121; *Perez, supra,* 111 Cal.App.4th 671; *Cummings, supra,* 11 Cal.App.4th 1383.)

## 2. *Government Code Section 12965*

The plain language of section 12965, subdivision (b), does not address whether awards of expert witness fees to prevailing defendants should be subject to the *Christiansburg* standard. (§ 12965, subd. (b) ["[i]n actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs, including expert witness fees . . ."].) The legislative history, however, shows that by amending section 12965 to provide for the recovery of expert witness fees, the Legislature sought to bring California law into alignment with Title VII. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999–2000 Reg. Sess.) as amended May 6, 1999, pp. 4–5.) Thus, we could infer that, in seeking uniformity with federal law, the Legislature intended to adopt the federal rule that "[a]ttorney's fees *and expert witness fees* may not be awarded to a

prevailing defendant in a Title VII case unless the plaintiff's claim is 'frivolous, unreasonable, or groundless, or . . . the plaintiff continued to litigate after it clearly became so.' [Citations.]" (*AFSME v. County of Nassau* (2d Cir. 1996) 96 F.3d 644, 646, italics added.) Accordingly, we will assume for purposes of this appeal that the Legislature implicitly intended the *Christiansburg* standard to apply when not only attorney fees, but also expert witness fees, are awarded under section 12965 to a prevailing defendant. This is not the end of the analysis, however. Even if Holman's FEHA claims were not "frivolous, unreasonable, or groundless," the trial court was still required to consider Altana's request for recovery of its expert witness fees under Code of Civil Procedure section 998.

### 3. *Code of Civil Procedure Section 998*

*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985 [73 Cal.Rptr.2d 682, 953 P.2d 858] (*Murillo*) is instructive in determining the proper interplay between the statutes. In *Murillo*, the buyer of a new motorhome alleged that the sellers had violated the Song-Beverly Consumer Warranty Act, popularly known as the automobile "lemon law."[28] The buyer refused an offer from the sellers to settle for $12,000. The sellers ultimately prevailed in the suit and sought costs. The buyer argued that the prevailing sellers had no right to recover costs, including expert witness fees, because the Song-Beverly Consumer Warranty Act provided only that the prevailing *buyer* was entitled to recover "costs and expenses, including attorney's fees . . . ." (Civ. Code, § 1794, subd. (d).) The provision was silent regarding the right of prevailing sellers to recover costs and fees. (*Murillo, supra*, 17 Cal.4th at pp. 988–990.) Nonetheless, the trial court awarded the sellers their costs, including expert witness fees, under Code of Civil Procedure sections 998 and 1032. (17 Cal.4th at p. 989.)

With respect to recovery of ordinary costs, the Supreme Court found no conflict between Civil Code section 1794, subdivision (d) and Code of Civil Procedure section 1032. The court observed that Code of Civil Procedure section 1032, subdivision (b) "grants a prevailing party the right to recover costs '[e]xcept as otherwise expressly provided by statute' " and that Civil Code section 1794, subdivision (d) makes no mention of prevailing sellers. (*Murillo, supra*, 17 Cal.4th at p. 991, italics omitted.) "[A]ny suggestion that prevailing sellers are prohibited from recovering their costs is at most *implied*. Accordingly . . . , we conclude Civil Code section 1794(d) does not provide an 'express' exception to the general rule permitting a seller, as a

---

[28] The Supreme Court noted that the Song-Beverly act is "strongly pro-consumer" and that because it " 'is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action. [Citation.]' [Citation.]" (*Murillo, supra*, 17 Cal.4th at p. 990, last brackets added.)

prevailing party, to recover its costs under [Code of Civil Procedure] section 1032(b)." (*Murillo, supra*, 17 Cal.4th at p. 991.)

The Supreme Court also concluded that the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.) did not preclude the trial court's award of expert witness fees, pursuant to Code of Civil Procedure section 998. The court reasoned: "Having concluded Civil Code section 1794(d) fails to set forth an express exception to the general cost-recovery rule set forth in [Code of Civil Procedure] section 1032(b), we likewise conclude it provides no exception to the provisions of [Code of Civil Procedure] section 998. [Code of Civil Procedure s]ection 998 explicitly states that it 'augment[s]' [Code of Civil Procedure] section 1032(b). Thus, the requirements for recovery of costs and fees under [Code of Civil Procedure] section 998 must be read in conjunction with C[ode of Civil Procedure] section 1032(b), including the requirement that [Code of Civil Procedure] section 998 costs and fees are available to the prevailing party '[e]xcept as otherwise *expressly* provided by statute.' ([Code Civ. Proc.,] § 1032(b), italics added.) Because the cost-shifting provisions of the Song-Beverly Act do not 'expressly' disable a prevailing defendant from recovering [Code of Civil Procedure] section 998 costs and fees in general, or expert witness fees in particular, we find nothing in the Act prohibiting the trial court's exercise of discretion to award expert witness fees to seller under the circumstances of this case." (*Murillo, supra*, 17 Cal.4th at p. 1000, fn. omitted.) The court also observed that its conclusion furthered the purpose of Code of Civil Procedure section 998. "Although the Legislature's purpose in enacting the Song-Beverly Act was admittedly to encourage consumers to enforce their rights under the Act, nothing in Civil Code section 1794(d) suggests this legislative purpose should override the Legislature's desire—expressed in [Code of Civil Procedure] section 998—to encourage the settlement of lawsuits." (*Murillo, supra*, 17 Cal.4th at p. 1001.)

Holman argues that Code of Civil Procedure section 998 has no application because costs are "otherwise *expressly* provided by statute" (Code Civ. Proc., § 1032, subd. (b), italics added) in section 12965. We disagree. As in *Murillo*, there is nothing in section 12965 that *expressly* disallows an award of expert witness fees to a prevailing FEHA defendant under Code of Civil Procedure section 998.[29] To the contrary, unlike the Song-Beverly Act, the statute here expressly *allows* recovery by any prevailing party.

Furthermore, there is nothing in section 12965 that *expressly* disallows an award of expert witness fees to a prevailing FEHA defendant unless the

---

[29] We note that, in a slightly different context, our Supreme Court recently found no conflict between the FEHA provisions for attorney fees under section 12965, and the provisions of Code of Civil Procedure section 1033, subdivision (a), allowing the trial court discretion to deny fees where an action could have been brought as a limited jurisdiction case. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 986–989 [104 Cal.Rptr.3d 710, 224 P.3d 41].)

*Christiansburg* standard is met. Thus, even if the *Christiansburg* standard implicitly applies when prevailing defendants seek to recover expert witness fees under section 12965, we conclude that the trial court was authorized to exercise its discretion under Code of Civil Procedure section 998 to award expert witness fees here. (See *Agnew v. State Bd. of Equalization* (2005) 134 Cal.App.4th 899, 915 [36 Cal.Rptr.3d 464] [prevailing party entitled to costs, "and possibly expert witness fees as well, under the general cost provisions of the Code of Civil Procedure even if he did not satisfy the Revenue and Taxation Code section 7156 criteria which would have entitled him to attorney fees as well as costs and expert witness fees"].)

Contrary to Holman's suggestion, *Mangano, supra,* 167 Cal.App.4th 944 did *not* indicate that the *Christiansburg* standard applies to "attorney fees *and other costs* in FEHA cases" regardless of the applicability of section 998. *Mangano* was a FEHA case in which the defendants had offered to pay the plaintiff $2,500 to settle the suit, before prevailing on their motion for summary judgment. Because the plaintiff did not accept the offer and ultimately received less than $2,500, defendants moved to recover their expert witness fees and attorney fees under Code of Civil Procedure section 998. (167 Cal.App.4th at p. 947.) The trial court granted the motion for expert witness fees, but denied recovery of attorney fees apparently on the ground that "the *Christiansburg* standard must be applied in a FEHA action regardless of the application of [Code of Civil Procedure] section 998." (*Id.* at pp. 947, 949, fn. omitted.) The prevailing defendants appealed the trial court's postjudgment order, to the extent it denied their motion for attorney fees. The plaintiff also appealed the postjudgment award of expert witness fees. (*Id.* at p. 947.)

The *Mangano* court affirmed the postjudgment order. (*Mangano, supra,* 167 Cal.App.4th at p. 947.) The published portion of the opinion only addressed the trial court's award of attorney fees. (*Id.* at pp. 948–949.) With respect to attorney fees, the defendants conceded that the plaintiff's case was not frivolous or meritless, but argued that the trial court should not have applied the *Christiansburg* standard to a Code of Civil Procedure section 998 claim. (167 Cal.App.4th at p. 949 & fn. 8.) The defendants argued that "they are entitled to attorney's fees as part of their [Code of Civil Procedure] section 998 costs despite the restrictions generally imposed in awarding a prevailing defendant fees in a FEHA action." (*Id.* at p. 949.) The court rejected this argument, first noting that "the costs awarded to a prevailing party pursuant to [Code of Civil Procedure] section 998 may include attorney's fees 'when authorized by' statute. ([Code Civ. Proc.,] § 1033.5, subd. (a)(10)(B); see also [Code Civ. Proc.,] §§ 998, 1032.)" (*Id.* at p. 948.) The court concluded that "[Code of Civil Procedure] section 998 does not eliminate the substantive requirements for awarding attorney's fees to a prevailing FEHA defendant" and that "[Code of Civil Procedure s]ection 998 instead merely expands the

group of those who are treated as prevailing parties and who therefore may be entitled to attorney's fees as prevailing parties under the relevant statute." (*Id.* at p. 951.) Accordingly, the court held that "the trial court was correct to apply the *Christiansburg* standard and, thus, to deny defendants' request for attorney's fees on the basis that the action was not without any legal or factual foundation." (*Ibid.*, fn. omitted.) However, while not discussed in the published section of the opinion, the court *affirmed* the expert witness fee award. (*Id.* at p. 952.)

■ The published portion of *Mangano* addresses only attorney fees. The Supreme Court, in *Murillo*, made clear that attorney fees are subject to different rules than those applicable to other costs. The court specifically noted: "Nothing in our opinion addresses [the recovery of attorney fees.] Sellers are not seeking attorney fees, and there is no 'default' attorney fee recovery provision akin to [Code Civil Procedure] section 1032(b). Indeed, the law is to the contrary. (See [Code Civ. Proc.,] § 1021 ['Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . .'].)" (*Murillo, supra,* 17 Cal.4th at p. 999, original ellipsis.) We conclude that the trial court properly awarded Altana expert witness fees pursuant to Code of Civil Procedure section 998.

### 4. *"Scaling" of Expert Fee Awards in FEHA Cases*

■ One other appellate court has approved award of expert witness fees as Code of Civil Procedure section 998 costs to a prevailing FEHA defendant. In *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550 [47 Cal.Rptr.3d 206] (*Seever*), the plaintiff in a disability discrimination action rejected a pretrial offer and suffered an adverse jury verdict. The trial court awarded costs pursuant to Code of Civil Procedure section 998, including expert fees. On appeal, Seever contended that the pretrial offer was fatally uncertain (relying on *Berg v. Darden* (2004) 120 Cal.App.4th 721, 727 [15 Cal.Rptr.3d 829]), and that certain costs were not in any event recoverable. While there was no contention in *Seever* that *Christiansburg* standards precluded such an award, the court acknowledged sua sponte that *Christiansburg* and subsequent cases "demonstrated sensitivity to the imbalance inherent in allowing equal cost-s[h]ifting between unequal parties" and the risk that shifting substantial litigation expenses "to what ordinarily are modest- or low-income individuals would unduly discourage [such] plaintiffs from litigating legitimate claims." (*Seever*, at p. 1562.) Affirming the grant of expert fees, the court nevertheless remanded the matter for reconsideration of the amount of the award. (*Id.* at p. 1562.) The court recognized that Code of Civil Procedure section 998 was designed to create economic incentives on both parties to settle rather than try their lawsuits, and that to further that goal, both sides

must face some economic consequences if it turns out they miscalculate and lose. "But consistent with the rationale of *Christiansburg* and like California decisions, it is entirely appropriate and indeed necessary for trial courts to 'scale' those awards downward to a figure that will not unduly pressure modest- or low-income plaintiffs into accepting unreasonable offers." (*Seever*, at p. 1562.)

The trial court here found that the amount of the expert fees claimed by Altana was reasonable, and Holman does not challenge that determination. However, in assessing whether an expert fee award is reasonable in amount, at least in the FEHA context where other recognized public policy consider- · ations apply, we agree that the court must not only look to whether the expense was reasonably incurred, but must also consider the economic resources of the offeree.[30] "Thus, when two competing parties possess vastly disparate economic resources, this may require the trial courts to 'scale' the financial incentives (in this instance the [Code Civ. Proc., §] 998 cost awards) to the parties' respective resources." (*Seever, supra*, 141 Cal.App.4th at p. 1562.) We believe that this result is both "in keeping with the policy set forth in *Christiansburg* regarding the unequal treatment of prevailing defend- ants and prevailing plaintiffs in a discrimination suit" (*Mangano, supra*, 167 Cal.App.4th at p. 951), the legislative policy reflected in section 12965, and the policy of Code of Civil Procedure section 998 that parties rejecting offers of litigation settlement must face economic consequences if they miscalculate and lose. (See also *Chavez v. City of Los Angeles, supra*, 47 Cal.4th at pp. 986–987 [trial court should consider underlying FEHA policy of encour- aging assertion of meritorious claims in determining whether action should have been initially filed as a limited jurisdiction case and whether attorney fees should be denied under Code Civ. Proc., § 1033, subd. (a)].)

Expert witness fees in any litigation are frequently substantial and the award at issue here is in excess of $125,000. While the disparity in Holman's resources was not clearly focused for the trial court (or in Holman's brief here), she did submit a declaration in connection with her reply to Altana's opposition to her motion to tax costs stating that she was indigent and receiving Social Security disability benefits. She also asserts her indigency here.[31] We will remand for the limited purpose of permitting the court to

---

[30] We express no opinion as to whether such an analysis could be required in any circumstance beyond the context of FEHA litigation. The Legislature has not included a means test as an element of determining awards generally under Code of Civil Procedure section 998, and imposing such a requirement would alter the settlement incentives provided by Code of Civil Procedure section 998. (See *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 186 [80 Cal.Rptr.3d 812].)

[31] Holman did not argue in her opening appellate brief that the trial court should have "scaled" the amount of the award downward in consideration of her financial situation and she

consider whether "scaling" of the amount of the expert fee award is appropriate considering the relative resources of the parties, and to exercise its discretion accordingly.[32]

## III. DISPOSITION

The judgment and the postjudgment order awarding expert witness fees as costs are affirmed. That portion of the judgment setting the amount of expert fees to be recovered by Altana as costs is vacated, and the matter remanded to the trial court for a further hearing on the amount of the award, consistent with the views expressed herein. The parties are to bear their own costs on appeal.

Jones, P. J., and Needham, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 22, 2010, S185211.

---

does not appear to have raised this argument before the trial court. Although we are therefore not required to consider the argument (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [27 Cal.Rptr.3d 648, 110 P.3d 903]; *Peterson v. John Crane, Inc.* (2007) 154 Cal.App.4th 498, 515 [65 Cal.Rptr.3d 185]), we exercise our discretion to address it because it presents an important question of public policy. We invited and received oral argument from the parties on the application of *Seever*.

[32] We concur with the observation in *Seever* that "seldom would a court properly deny a successful defendant its entire [Code of Civil Procedure] section 998 cost award, even in a FEHA case." (*Seever, supra,* 141 Cal.App.4th at p. 1562.)